Khalifa Hamaas Abdul KHAALIS,
Appellant,

v.

UNITED STATES, Appellee.

Abdul RAHIM, a/k/a Philip
Young, Appellant,

v.

UNITED STATES, Appellee.

Abdul NUH, a/k/a Mark E.
Gibson, Appellant,

v.

UNITED STATES, Appellee.

Abdul SHAHEED, Appellant,

v.

UNITED STATES, Appellee.

Abdul AL QAWEE, a/k/a Samuel
Young, Appellant,

v.

UNITED STATES, Appellee.

Abdul LATIF, a/k/a Carl E.
Roper, Appellant,

v.

UNITED STATES, Appellee.

Abdul HAMID, a/k/a Hilvan Jude
Finch, Appellant,

v.

UNITED STATES, Appellee.

Abdul RAZZAAQ, a/k/a Nelson
McQueen, Jr., Appellant,

v.

UNITED STATES, Appellee.

Abdul ADAM, a/k/a George W.
Smith, Appellant,

v.

UNITED STATES, Appellee.

Abdul MUZIKIR, a/k/a Marquette
Anthony Hall, Appellant,

v.

UNITED STATES, Appellee.

Abdul SALAAM, a/k/a Clarence
White, Appellant,

v.

UNITED STATES, Appellee.

Abdul RAHMAN, a/k/a Clyde
Young, Appellant,

v.

UNITED STATES, Appellee.

Nos. 12748 to 12754 and 13088 to 13093.

District of Columbia Court of Appeals.

Argued Feb. 22, 1979.

Decided Oct. 22, 1979.

Rehearing En Banc Denied
Feb. 20, 1980.

Harry Toussaint Alexander, Washington, D. C., with whom W. Theophilus Jones, Washington, D. C., was on the brief, for appellants Khaalis and Adam.

Dennis O'Keefe, Charles A. Kubinski, Stephen J. O'Brien, John F. Mercer, Grandison E. Hill, Francis S. Smith, and Christopher G. Hoge, with whom John W. Sansing, Charles F. Stow, and John Treanor, Washington, D. C., all appointed by the court, were on brief, for appellants Rahim, Nuh, Shaheed, Al Qawee, Latif, Hamid, Razzaaq, Muzikir, Salaam and Rahman.

John R. Fisher, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Martin J. Linsky, Mark H. Tuohey, III, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KERN, MACK and FERREN, Associate Judges.

1. D.C.Code 1973, §§ 22–105a; –2401; –2403 and –3202; –502; –501 and –3202; –2101 and –3202, respectively. Appellant Adam was charged, additionally, with one count of assault with a dangerous weapon, D.C.Code 1973, § 22–502.

2. The jury found appellant Khaalis guilty on 29 of the 31 counts with which he was charged, including conspiracy to commit kidnapping while armed, second-degree murder, two counts of assault with intent to kill while armed, one count of assault with a dangerous weapon, and 24 counts of kidnapping while armed (eight counts relating to each of the three sites).

Appellant Adam was found guilty on 11 of the 32 counts in which he was charged, including conspiracy to commit kidnapping while armed, two counts of assault with a dangerous weapon, and eight counts of kidnapping while armed (based upon the kidnappings at B'nai B'rith).

FERREN, Associate Judge:

On May 3, 1977, the grand jury indicted each of the twelve appellants on 31 counts, including conspiracy to commit kidnapping while armed, first-degree felony murder, second-degree murder while armed, and numerous counts of assault with a dangerous weapon, assault with intent to kill while armed, and kidnapping while armed.[1] The charges arose out of events which came to be known as the "Hanafi" takeovers. On March 9, 1977, the twelve appellants, heavily armed, had invaded three sites in the District of Columbia (B'nai B'rith Headquarters, the Islamic Center, and the District Building), seized more than 130 hostages, murdered one man, wounded numerous others (some severely), held the hostages at gunpoint for nearly 39 hours, and repeatedly threatened them with execution by beheading.

Intensive *voir dire* of prospective jurors for a joint trial began on May 31, 1977. The jury was sworn on June 6 and immediately sequestered. Almost seven weeks later, on July 20, the jury began deliberations. It returned its verdicts on July 23, finding each appellant guilty of multiple offenses while also acquitting each on a number of the charges.[2] Khaalis was convicted of substantive offenses occurring at

The jury found appellants Latif, Shaheed, Hamid, Razzaaq, and Salaam each guilty on ten counts, including conspiracy to commit kidnapping while armed, assault with a dangerous weapon, and eight counts of kidnapping while armed (based upon the kidnappings at B'nai B'rith).

Appellants Rahman, Rahim, and Al Qawee were each found guilty on nine of the 31 counts in which they were charged, including conspiracy to commit kidnapping while armed and eight counts of kidnapping while armed (based upon the kidnappings at the Islamic Center).

Appellants Muzikir and Nuh were each found guilty of conspiracy to commit kidnapping while armed, second-degree murder, two counts of assault with intent to kill while armed, and eight counts of kidnapping while armed (based on the kidnappings at the District Building).

all three sites. The others were convicted only of conspiracy to commit kidnapping while armed and of substantive offenses occurring at a particular takeover site.

Counsel filed motions for a new trial. They were denied. On September 6, 1977, after presentence reports had been filed, the court imposed consecutive and concurrent sentences totaling the following years of imprisonment: Khaalis, 41 to 123 years; Adam, 44 to 132 years; Latif, Shaheed and Hamid, 36 to 108 years; Razzaaq and Salaam, 40 to 120 years; Rahman and Rahim, 28 to 84 years; Al Qawee, 24 to 72 years; Muzikir, 77 years to life; and Nuh, 47 years to life. These appeals followed.

We begin with a summary of the government's evidence (Part I), followed by discussion of sixteen issues raised on appeal: alleged prejudicial publicity before and during the trial (Part II); denial of a pretrial motion to dismiss the indictment because of the prosecution's alleged interference with defense efforts to interview government witnesses (Part III); admission into evidence of conversations from allegedly unlawful emergency wiretaps of telephones at B'nai B'rith headquarters (Part IV); denial of the defense request for a "multiple conspiracy" instruction (Part V); allegedly improper curtailment of cross-examination (Part VI); alleged prosecutorial misconduct (Part VII); alleged judicial misconduct (Part VIII); the court's refusal to conduct a hearing on post-trial evidence that a juror may have been suffering from a mental infirmity during jury deliberations (Part IX); applicability of the District of Columbia kidnapping statute (Part X.A.); alleged systematic exclusion of Hanafi Muslims from the jury selection system (Part X.B.); allegedly improper use of "mug shot" photographs in the identification process (Part X.C.); refusal to sever appellant Adam's assault with a deadly weapon count (Part X.D.); revocation of appellant Khaalis' conditional release and his commitment to jail without bond, prior to indictment (Part X.E.); and the lengths of sentences, the refusal to permit appellants and their counsel to appear before the grand jury, and the alleged absence of appellants at a critical stage of the proceedings (Part X.F.).

We hold that none of these contentions has merit; we affirm all convictions.

## I. THE FACTS

On March 9, 1977, at around 11:15 a. m., Khaalis, Adam, Shaheed, Latif, Hamid, Razzaaq, and Salaam arrived at B'nai B'rith headquarters (1640 Rhode Island Avenue, N.W.) in a U–Haul truck loaded with various weapons and ammunition. All heavily armed, they rushed into the lobby, held several persons at gunpoint, and announced that they had come to take over the building. They next commandeered the elevators and unloaded their weapons from the truck; then, with weapons drawn, they swept through the building, gathering more than 100 men and women as hostages. These hostages ultimately were taken to the eighth floor of the building, where, for the next 39 hours, they were repeatedly warned that if appellants' demands were not met, "blood would flow, heads would roll, people will die."

That same day, at approximately 12:30 p. m., appellants Rahman, Rahim, and Al Qawee, heavily armed with guns, knives, and machetes, attacked the Islamic Center at 2551 Massachusetts Avenue, N.W., a religious cultural organization. They took eleven hostages and, for the next 37 hours, threatened them with death if the demands made by Khaalis were not met.

Finally, on the same day at approximately 2:30 p. m., appellants Muzikir and Nuh, armed with a shotgun, machetes, and knives, entered the District Building at 14th and E Streets, N.W. They proceeded directly to the fifth floor, where the offices of the Mayor and the City Council are located. They captured a building guard at gunpoint and seized 14 other hostages. For the next 35 hours these hostages also were threatened with death if Khaalis' demands were not met.

Khaalis made three principal demands. He insisted that (1) the showing of a movie —"Mohammad, Messenger of God"—be halted in New York and other places, that

(2) the convicted murderers of Khaalis' family be turned over to appellants for punishment,[3] and that (3) Khaalis receive a refund of $750 which he believed he had been fined for an earlier contempt of court.

Although Khaalis was at B'nai B'rith, the government's evidence demonstrated that he directed the activities of the men at the other two sites. They, in turn, referred inquiries from the police and the press to Khaalis. On Friday, March 11, at approximately 2 a. m., 39 hours after the B'nai B'rith takeover—and as a result of extensive negotiations—appellants released all their hostages. Appellants were then arrested. A more detailed account of events at each site follows.

## A. *B'nai B'rith Headquarters*

### 1. *The Takeover*

When Khaalis and three other appellants entered the first floor lobby of B'nai B'rith Headquarters,[4] they confronted James Pulley (a security guard) with a large gun, forced him against the wall, and took him to the back of the building where he was ordered to lie with his nose on the floor. While a man with a pistol and a machete guarded him and several other hostages, Pulley heard one of the armed men say, "Get the guns out of the truck." He also heard a shot fired.

Khaalis and the three other appellants then took the elevator upstairs and swept through the building, taking more than 100 hostages. Initially, groups of hostages were herded, under a show of guns and a machete, into rooms on the second and fifth floors. Then, they were subjected to much verbal abuse, including obscenities. They were ordered to lie face-down on the floor or, if there was no floor space left, to lie on top of each other. During this initial phase of the takeover appellants physically assaulted many of the hostages.[5]

3. On January 18, 1973, while Khaalis and his wife, Khadyja, were away from the family home (which also served as the headquarters of the Orthodox Hanafi Muslims in the United States), eight men came to the house and murdered six of the occupants and severely injured two others. (This attack was a response to letters which Khaalis had written to Muslim mosques throughout the United States, denouncing Elijah Muhammed, then spiritual leader of the Nation of Islam, sometimes known as the "Black Muslims." *See Christian v. United States,* D.C.App., 394 A.2d 1 (1978), for a development of the facts in that case.) In brief, Khaalis' 25-year old son and 10-year old son were shot in the head, four infants (children or grandchildren of Khaalis) were drowned, and a friend of the family was shot and killed; Khaalis' daughter was shot several times in the head but survived; and Khaalis' wife, Bibi, although she survived, was paralyzed and remains severely impaired, both mentally and physically. Police investigation and various criminal proceedings resulted in convictions of three men, affirmed by this court. *See Christian v. United States, supra* at 7–8 n. 1, 2 & 4.

4. In this statement of the facts, individual appellants are identified only when the witnesses made such a positive identification at trial with reference to specific actions. When a witness could testify only that one of the appellants—*i. e.,* one of the persons holding them hostage—had perpetrated a specific act, it is so noted, without a specific identification of any one ap-

pellant. Note that only appellants Khaalis, Adam, Latif, Shaheed, Hamid, Razzaaq, Salaam, Muzikir, and Nuh were convicted on counts of assault (with a dangerous weapon) on various victims, although all appellants had been indicted and tried (on alternative theories of conspiracy and aiding-and-abetting) for all the assaults on all the named victims. Most of the appellants were acquitted on most of the assault charges. *See* note 2 *supra.*

5. Razzaaq entered Wesley Hymes' office and forced him at gunpoint into the hallway, where Adam split open Hymes' finger and thumb with a machete, and nearly severed another finger from his hand. Hymes started to run but was shot in the shoulder from behind. He attempted to crawl away, but the gunmen forced him to join the other hostages lying on the floor. He could see Brian Golliday, a co-worker, who was bleeding from the mouth, nose, and eyes. During the time that Hymes lay there, without any medical attention, he heard Khaalis call a woman "a stinking Jew bitch" and also say, "Yehoudis, get the hell out of America! Trying to take over the damned world!" After about an hour and a half, Hymes and six other hostages were told to get up and go to the elevators. They were instructed to thank Allah that they were alive. They did so and were released. Khaalis later testified that he had promised Allah that he would release the first seven hostages. *See* Part I.E. *infra.*

Razzaaq also entered Rabbi Samuel Fishman's office and ordered him and others, at

## 2. *The Siege—8th floor*

Appellants, at gunpoint, ordered all the hostages who had been collected in the second and fifth floor rooms to the eighth floor, where they were held for the remainder of their 39-hour ordeal. Appellants moved the women out first, ten at a time, and then moved the men, four to five at once. The gunmen stood the men against the wall and tied their hands behind their backs. Khaalis called Sidney Clearfield to the front of the line. According to Clearfield, Khaalis "said he didn't like the way I was looking—and he punched me in the stomach." Another appellant asked if he could hit Clearfield, too, but Khaalis said, "No. I am going to give him my special karate punch," and Khaalis hit Clearfield again in the stomach.

When the more than 100 hostages had been taken to the eighth floor, appellant subjected them to further physical assaults and personal indignities. They were ordered to lie face-down on the cold, bare cement floor of a large auditorium-like room undergoing renovation. Each hostage was ordered to grasp the ankles or legs of

the person above him. Appellants made several attempts to count the hostages. At first, they ordered the men and women to count off. Then appellants began counting off the hostages by twenties. The final figure was 103 hostages.

The women were separated from the men into one area of the large room on the eighth floor. Khaalis ordered other appellants to tie the hands and feet of the men, either with neckties or telephone wire. One of the gunmen ordered the men to empty their pockets. After approximately half an hour, appellants permitted the men and women to sit up.

The hostages remained on the eighth floor from midday of March 9 until approximately 2 a. m. on Friday, March 11. Several testified that they were forced to work for appellants—stacking desks and filing cabinets against the windows, painting the windows so that the police would not be able to see into the room, and setting up barricades of desks, cabinets, ladders, and other debris in the staircases. Others elaborated on the numerous physical and verbal assaults.[6] Still others testified about the

gunpoint, to the second floor, where a gunman struck Fishman with a pistol, opening a wound over the eye. Fishman was forced to crawl across some of the 35 to 40 men and women who had been ordered to lie on the floor or on top of others.

After Adam and Latif confronted Alton Kirkland and twelve others on the seventh floor, Adam pulled a knife, stabbed Kirkland in the left thigh and the back, kicked him, put a pistol to his ear, and announced that he would kill him. Latif intervened and told Adam not to hurt Kirkland any more. Sandra Rosen, a hostage, tried to apply first aid, but she was told "No. Let him bleed." The hostages, including Kirkland, were taken to the fifth and then the eighth floor. There, Mrs. Rosen told one of the gunmen that Kirkland was losing a lot of blood and would die if he were not given proper medical attention. Shortly thereafter, Kirkland was released.

**6.** For example, Charles Mason testified that he was a painter, working at B'nai B'rith on March 9. Some time during that afternoon, Salaam referred to Mason as a hero. Khaalis overheard this, walked over to Mason, and then said, "Oh, you're a hero? I'll cut your head off." Mason said, "If it is my time to die it is my time to die." Khaalis ordered Mason to stand up. Mason testified that he was hit from

behind and fell, dazed, to the concrete floor, where he lay face-down for four to five hours. Later, when he was regaining consciousness, he was squirming to get comfortable, when Salaam put his foot to Mason's back and commanded, "Keep still! Lay face down and don't move." Mason answered the gunman by saying, "I'm not gonna lay like this. You might as well pull the trigger." Khaalis came back, told the gunman to untie Mason, and told one of the women to take him to the bathroom to wash his head off. Several other hostages corroborated Mason's testimony—specifically that Khaalis "came over [to Mason] with a pistol in his hand and cracked him against the side of his head. He fell down in front of us and he was tied in front of us as we looked on."

Henry Siegel testified that on the evening of March 9, he complained to one of the appellants that he was having trouble breathing (he had recently suffered a heart attack). Siegel suggested that he could breathe more easily if his hands were tied in front, rather than behind. Razzaaq then tied Siegel's hands above his head. Khaalis came in and inquired why Siegel was given a "special privilege." Khaalis ordered Razzaaq to have Siegel stand up. Khaalis said, "Don't you die on me! . . . Heart attack is a dirty way to die. Let me cut

indignities caused by appellants' initial refusal to permit hostages to use the bathroom.[7]

### 3. *Khaalis' Demands*

Henry Siegel testified that after the hostages had been gathered on the eighth floor, Khaalis announced, "I am Khalifa Hamaas Abdul Khaalis." Khaalis was very pleased, for he said that he had asked Allah for a hundred hostages and Allah had presented him with one hundred and three. Khaalis told the hostages that this was a "holy war." He said, "Be prepared to die because many of you will die and heads will be blown, brains will be blown out and heads will roll! . . . In a holy war there are no innocent victims. Men, women and children die in holy wars, and if you have any sense you will pray to your God and be prepared to die." Khaalis told the hostages that he wanted the Black Muslims who had killed his family, *see* note 3 *supra,* and he wanted the movie—"Mohammad, Messenger of God"—stopped and burned.[8] Shirley Feigenbaum, one of the hostages, added that Khaalis blamed the Jews for the fact that the murderers of his family were not dead, because the Jews controlled the banks, the newspapers, and the media.

When District police, including Sergeant Albert Skoloda, arrived at B'nai B'rith Headquarters, a man identified himself as Khalifa Hamaas Abdul Khaalis and threatened that if the movie "Mohammad, Messenger of God," then being shown in New York, "is not stopped at two o'clock, we are going to cut heads off and throw them down the stairwell." Khaalis also instructed Sergeant Skoloda to have someone call Khaalis' home. Khaalis added that he himself would call shortly, and that if everything was not all right, "heads were going to come down the stairwell." Sergeant Skoloda testified that when he pleaded with Khaalis not to hurt anyone, Khaalis responded that "no one had cared when his babies were killed," and that "Washington had never seen as much blood as would be shed if what he wanted wasn't granted."

### 4. *Evidence of a Conspiracy*

Throughout the period of these events at B'nai B'rith, the Islamic Center, and the District Building, appellants at each site made numerous references to the takeovers at the other sites and communicated with each other.

After all the hostages had been assembled on the eighth floor of B'nai B'rith Headquarters, Khaalis spoke to them, saying (according to Fishman and others):

> I want to remind all of you of a terrible deed which happened to me and my family, something which you in this room did not show any compassion concerning when it occurred, and I am out for justice in this matter . . . . This is only the

your head off. It's quick and clean. . . . You won't feel a thing." Khaalis grabbed a sword. Siegel told Khaalis that he felt much better and thought he would be able to survive. Khaalis said, "If you change your mind, let me know." The following morning, Khaalis asked why Siegel was still tied and directed one of appellants to untie Siegel's hands. Several hours later, Khaalis called Siegel to the front of the room and told a gunman to point a rifle at his head. Khaalis said, "Mr. Siegel, there is an elevator coming up. If there is a cop on top of [the] elevator he is dead and you're dead." Siegel was then released.

7. Shirley Feigenbaum testified that early in the afternoon of March 9, several of the hostages requested permission to use the bathroom, but appellants refused. Appellants then ridiculed those hostages who wet themselves and made them change into some old overalls found in the building. Marilyn Bargteil testified that eventually the hostages were permitted to go to the bathroom, but that the gunmen escorted them there at gunpoint. A gunman would sit down with a rifle on his lap and watch as the hostages went into the bathroom (the door was not shut). Sandra Rosen testified that on one occasion, as she passed appellant Adam on her way to the bathroom, Adam told her, "I see the hate in your eyes, you Yehoudi whore. When we get to work on the women you will be number one."

8. Khaalis also said that he intended to request that the killer of Malcolm X be delivered to him for punishment, and that a black person from San Francisco who had murdered a girl be delivered to him. Khaalis did not pursue these two latter demands, but focused on stopping the movie and on demanding the killers of his family.

beginning of an operation which will cause those who have ignored my plight up until this point to sit up and take notice . . . .. This is only the beginning and you will be hearing of other things to come.

Later in the afternoon of March 9, Khaalis told the hostages, "We have now taken over the District Building and the Islamic mosque, and there is still more to come which will cause everyone to take notice." At one time, according to Henry Siegel, Khaalis said, "We've taken the Islamic Center. We've got . . . Dr. [Mohammad] Rauf"; and later, "We're in the District Building. Marion Barry has been shot. But we missed Arrington Dixon and Nadine Winter." William Ferguson testified that "there was some kind of reaction from some of the co-defendants, more or less kind of laughter, kind of approval, the fact that Marion Barry had been shot. . . ." Ferguson also testified that Khaalis, from the outset, had warned the hostages:

I want to let you people know what is going on . . . .. We are not—this is not the only thing that is happening here, here at B'nai B'rith. There are other things in this city that are going on. There are other places where we have taken over, and we are holding hostages. . . .

Khaalis further told

us to remember that, if any of us intended to be heroes and try to—try to disarm our captors and overtake—overpower them, that if we did so we would be directly jeopardizing the lives of other people in other places. He also stated we should be aware, too, that it probably diminished our very slim chances anyway, of being rescued by the police, that the police, if they did anything at all, would have to move in precision-like fashion, at more than one place.

Early in the afternoon of March 9, Khaalis asked the group of captives if there were someone who would help with the telephones. Mrs. Betty Neal said that she would. Khaalis took Mrs. Neal to another area of the eighth floor. She stayed there

for most of the remainder of the siege, placing and answering phone calls for Khaalis to and from his home, the police, the Islamic Center, the District Building, and the news media.

When Mrs. Neal sat down at a desk near the telephones, Khaalis gave her two phone numbers for his home and three for the Islamic Center. Mrs. Neal was immediately directed to place a call to Khaalis' family at home, and then to the Islamic Center. Sometime between 2 and 3 p. m. that first afternoon she dialed the number for the Islamic Center, told the person who answered that Khaalis wanted to speak with one of his men, and handed the phone to Khaalis. He "told them to remain calm, not to get excited, to keep their cool." Neal testified that during the entire time she served as Khaalis' telephone operator, she made at least 10 to 12 calls to the Islamic Center, and an equal number of calls came in from appellants at the Islamic Center, including calls from the Islamic Center from a man who identified himself as Rahman.

Sometime between 5 and 6 p. m. on March 9, one of the appellants brought a radio into the telephone area. Mrs. Neal heard a report that there had been a takeover at the District Building and that a man had been killed. About 30 minutes later, Khaalis told her to get the District Building on the telephone. A man answered, and Mrs. Neal informed him that "Mr. Khaalis would like to speak with one of his men." Khaalis took the phone and said, "Keep cool, be alert, keep on top of things." Later in the evening, Khaalis called the District Building and told his men that they could let the hostages go to the bathroom. Mrs. Neal testified that during the siege, there were approximately twelve telephone calls between B'nai B'rith and the District Building, equally divided between incoming and outgoing calls.

### 5. *Conclusion at B'nai B'rith*

On Friday, March 11, at approximately 1:40 a. m., as a result of negotiations with Khaalis, the hostages were freed. Khaalis, Adam, Latif, Hamid, Razzaaq, Shaheed, and Salaam were arrested.

The police conducted searches incident to these arrests and collected numerous weapons from appellants. On Khaalis, they discovered a .35 caliber Baretta pistol, three knives, and a straight razor. On Adam, they found 11 live shotgun shells. On Latif, they found a U–Haul key, an expended bullet, and a "buck knife." From Shaheed, they took five .30 caliber bullets. From Hamid, they retrieved four knives and two knife sheaths. On Razzaaq, they found a knife in a sheath. No weapons were discovered on Salaam's person.

Crime scene examination officers later searched the building and the U–Haul truck parked outside. They recovered an arsenal of weapons, all operable: 20 firearms (including carbines, shotguns, rifles with mounted telescopic sights, revolvers, and semi-automatic pistols), 8,700 rounds of live ammunition for the weapons, three axes or hatchets, twelve folding knives and razors, 19 fixed-blade knives, eight machetes, a cross-bow with arrows, a blackjack, throwing stars, and garrotes. The police also recovered a number of expended shell casings and spent slugs and fragments of slugs.

### B. Islamic Center

#### 1. The Takeover

On March 9, 1977, at 12:30 p. m., approximately one and a half hours after the takeover at B'nai B'rith, appellants Rahman, Rahim, and Al Qawee entered the Islamic Center and seized eleven hostages. Each of the three was armed with a firearm and a machete. They entered the office area and grabbed Mushk Ara, a secretary, by the neck. They forced Miss Ara and Mrs. Fauzia Bayoumi, a bookkeeper, into the adjacent office of Miss Von Goetz, secretary to the director of the Center. Miss Von Goetz heard shouting, turned to flee, but was seized from behind. She testified that a "hand was clapped over my mouth and I was dragged off my feet. . . ." Appellants forced the three women into a corner of the office. One appellant went upstairs to get Mrs. Rauf, the director's wife, and brought her down from her apartment.

Dr. Mohammad Rauf, director of the Islamic Center, testified that as he was returning to his office after midday prayers, someone grabbed the collar of his shirt and pointed a rifle at his back. Appellants compelled Dr. Rauf to stand with the other hostages. Shortly thereafter a gunman brought Rauf's wife down from their apartment. Dr. Rauf asked the gunmen, "Who are you?" One of them replied, "You know Hamaas? You know the children who were unfortunately killed?" They accused Rauf of misinterpreting Islam in this country. Rauf then saw appellants load their guns.

The three appellants collected a total of eleven hostages. Some were employees of the Center; others were visitors. The gunmen took the women into one office and held the men in Dr. Rauf's office, where they bound their feet and hands.

#### 2. The Siege; the Demands

Dr. Rauf was the focus of the takeover at the Islamic Center. Shortly after appellants had taken their hostages, Rahman dialed a phone number from memory and reported, "We are now in complete control of the Islamic Center and we are holding [eleven] hostage including Rauf." One of the appellants pulled Dr. Rauf over to the phone and told him to speak. Rauf testified that "it was Brother Hamaas" on the phone. Khaalis accused Rauf of "playing a game against him," blamed Rauf for not doing enough to stop the showing of the movie of Mohammad's life, and accused Rauf of supporting the X's (Khaalis and his men referred to the Black Muslim group headed by Wallace Mohammad in Chicago as the "X's").

Throughout the siege, appellants at the Islamic Center made demands identical to those being made by Khaalis at B'nai B'rith. They demanded that the movie, "Mohammad, Messenger of God," cease to be shown, and that the murderers of Khaalis' family be taken from prison and brought before Hamaas. The hostages were constantly threatened: if the demands were not met, "heads would roll." Dr. Rauf per-

sonally was threatened with death a number of times. He testified that he was told he "would be very lucky to leave this building with my head over my shoulders, and I heard it said more than once that if any move should be made, Rauf's head would roll out of the window." On one occasion, when appellants thought the police might storm the building, Rauf was told to stand up and was held by the neck. A rifle was placed on his back. One of the appellants said that if anything happened, "Rauf's head would be chopped off or would be blown off." On another occasion, Rauf's legs were untied and he was brought to the entrance of the building with a rifle at his back. One of the appellants looked through the peephole of the door and said, "[I]f there was any foul play . . . Rauf's head would be chopped off first. . . ." It was only then that Rauf realized that a box of food had been brought to the door for the hostages.

Dr. Rauf was forced to sit in a chair until late in the second evening of the siege, when he was permitted to lie down on the floor. This occurred after he had been told by one of the appellants that Brother Hamaas had decided not to kill Rauf's wife.

The hostages were given food and allowed to go to the bathroom, under guard. Two of the women were released before the end of the siege.[9]

### 3. Evidence of a Conspiracy

Khaalis spoke with Dr. Rauf more than once over the phone. On the second call, Khaalis asked Dr. Rauf to "call the ambassadors of Muslim governments, both in Washington and the United Nations, to use their offices to stop showing of the film. . . ." Reverend Robert Tesdell, a visitor held hostage at the Center, testified that appellants were very threatening to Dr. Rauf; they warned that he would die unless he saw that those phone calls were made. Dr. Rauf attempted to reach the ambassador of Afghanistan, but he was out

of town. Rauf explained the situation to the second-ranking official and asked him to call the other ambassadors—to do something very quickly to get the film stopped. Rauf also called the Consulate General at the United Nations and requested him to call the ambassadors to the United Nations to seek their help in getting the film stopped. This official later called back to report that the showing of the film had been stopped.

Tesdell and others testified that calls from overseas newsmen, local persons, members of the hostages' families, and the police began pouring in. Appellants instructed the news media and others to call the number at the B'nai B'rith headquarters to get answers to their questions from "Mr. Hamaas."

### 4. Conclusion at the Islamic Center

On Friday, March 11, at approximately 2 a. m., appellants Rahman, Rahim, and Al Qawee were arrested. The hostages were released, 37 hours after the takeover. A police search of the area of the Center where the hostages had been held yielded a loaded revolver, a rifle, a .12 gauge shotgun, knives, machetes, chains and padlocks, a throwing star, a bayonet, and more than 300 rounds of live ammunition for the three firearms.

### C. The District Building

### 1. The Takeover

On March 9, 1977, at approximately 2:30 p. m., three hours after the B'nai B'rith takeover and one and a half hours after seizure of the Islamic Center, Muzikir and Nuh entered the District Building and proceeded to the fifth floor. Within 20 minutes, Muzikir and Nuh had taken 15 men and women as hostages, Officer Cantrell and Marion Barry (then Councilman-at-large) had been shot and wounded, Maurice Williams (a reporter) had been shot and killed, and Robert Pierce (a law student/intern) had been shot and paralyzed for life.

---

9. Mushk Ara was let go on Wednesday evening after appellants had confirmed that she was from Bangladesh; Miss Von Goetz was released on Thursday afternoon after she had told appellants that she had a heart condition and was feeling ill.

Muzikir was carrying a .12 gauge shotgun which protruded from underneath a garment. Nuh carried a machete. Muzikir approached Special Police Officer John Austin, pointed the shotgun at Austin's face, and ordered him to proceed to room 507, the reception and outer office area of Sterling Tucker (then District of Columbia Council Chairman). As they walked through the area—a machete at Austin's neck—Nuh and Muzikir ordered the receptionist and several others who were waiting there for meetings to move into room 507 and "lie down on your stomachs and not to move a muscle. Otherwise he'd blow our brains out."

Several other men and women who were at their desks in room 507, or later entered, were taken captive. All were ordered to lie on their stomachs on the floor. Nuh tied them with cord from the venetian blinds, with telephone cord, and with masking tape.

### 2. The Siege—5th Floor

Officers Cantrell and Yancy had been alerted to trouble on the fifth floor. Armed with .38 caliber revolvers, they walked toward the double doors leading to the City Council offices. Officer Cantrell opened one of the double doors, and Yancy spied a man in a long, blue coat standing with his back to them. Suddenly, the gunman (later identified by several hostages as Muzikir) turned and fired the shotgun. Cantrell fell wounded to the floor; Yancy jumped onto the elevator and rode down to the first floor.

Cantrell was bleeding profusely from the right side of his face. (Ballistics evidence introduced at trial showed that Muzikir's shotgun had been loaded with double 00 buckshot—the kind found in Cantrell's face.) Austin testified that he also had seen Muzikir "twirl[] and fire[] at the doorway" through which Austin could see the figure of a uniformed man. Shortly thereafter, other police officers came to the fifth floor and, amidst more gunfire, managed to carry Cantrell downstairs to an ambulance.

At the same time that Officers Cantrell and Yancy were approaching the double doors on the fifth floor, Stephen Colter (a reporter for the Washington Afro-American) and Maurice Williams (a reporter for radio station WHUR) had just stepped off the elevator onto the fifth floor. Colter testified that the two reporters saw the officer begin to open one of the double doors when a shotgun blast hit Maurice Williams. Williams exclaimed to Colter, "I'm shot!" and stumbled to the floor. Colter took shelter in a nearby office, then turned and saw that Maurice Williams had fallen on his back and was lying in a pool of blood. Colter also saw Cantrell lying on the floor in blood. Colter ran to check on Williams but found no signs of life. He then immediately fled to the press room and remained there for five to ten minutes until the police arrived. Ballistics evidence introduced at trial demonstrated that five pellets of double 00 buckshot had been fired from Muzikir's shotgun and struck Williams in the chest, killing him instantaneously.

Marion Barry happened to ride the elevator to the fifth floor with Officers Cantrell and Yancy. He had started to talk with a friend in the hallway when he saw the officers walking toward the City Council offices. Barry suddenly heard a gunshot and "felt a sharp stinging sensation in my chest, and . . . I just instinctively knew I had been shot, and my chest started burning." Barry dived behind some columns of the building, then stumbled into an office and told the persons there, "I've been shot. Call the ambulance."

Police Officers Malcolm Hall and Carroll Hebron were alerted by a radio call to trouble at the District Building. They rushed to the building and took the stairs to the fifth floor. Officer Hall saw Maurice Williams lying on his back with his eyes open, perfectly still. Hall ran to him and placed his hand on Williams' chest but detected no signs of life. Officer Hebron began to help Officer Cantrell, who was covered with blood and wounded in the head and face. As Officer Hall started across the hallway toward Hebron and

Cantrell, a gun was fired from behind the double doors; the shot struck glass in the Mayor's office. Other police officers arrived and started sliding heavy oak tables into the hallway as a barricade. Shotgun blasts continued to come from behind the double doors; the officers responded with gunfire.

Several hostages—Alan Grip, Elsie Young, and Cordelia Wilkins—were inside the room with Muzikir. They testified that Muzikir was shooting toward the hallway, and that a volley of automatic gunfire entered the room. They described the confusion and the screaming by hostages. The same three hostages also testified that Muzikir, after firing at the police, turned and pointed his shotgun toward the hostages and fired into the back of Robert Pierce. Alan Grip testified that "during the automatic weapons fire, right near the end of it, I saw the man with the shotgun [Muzikir] . . . point his shotgun in the direction of Mr. Pierce and myself. And I heard his shotgun go off. I saw the gun jump in his hand, and I saw Mr. Pierce's face contort." Other hostages testified that they heard Pierce groan and cry out in pain. Pierce himself testified: "I felt that I was hit . . that I appeared to be paralyzed from the waist down, and that I was bleeding . . from my right arm." [10]

Meanwhile, the police had been returning Muzikir's fire. Some used shotguns, loaded with No. 4 buckshot, but none used double 00 buckshot, the kind found in the wounded—Officer Cantrell and Robert Pierce. The firing broke most of the glass surrounding the double doors. One officer observed persons lying on the floor, tied up, and immediately yelled for everyone to cease fire.

After the firing had stopped, appellants sent out Cordelia Wilkins to explain the situation inside the offices to the police; she did not rejoin the hostages. Alan Grip asked Muzikir if Pierce could leave to get

medical attention. Muzikir agreed, but Pierce could not move his legs. Muzikir said he would let the wounded man go if two naked policemen came in to get him, but the police refused to agree to those terms. The gunmen let two women drag Pierce out. They pulled him just to the double doors, released him, and then escaped through the open panel. A police officer quickly picked up Pierce and carried him outside. Eleven hostages remained for the duration of the siege.

Soon after the hostages had been herded into the room, Muzikir directed Nuh to get the hostages' wallets—"Let's see if we have somebody important!" Appellants were disgusted that they had not taken (then) Mayor Walter Washington, Marion Barry, or someone else of importance. (Muzikir, however, later expressed satisfaction when he heard over the radio that Barry had been shot.)

During the siege, some of the hostages were forced to take turns sitting on a chair placed inside the door. They were ordered to report on police activity and told they would serve as a human shield. Mrs. Thomas, who sat in the chair for some time, was told that "[i]f the policemen made any move to try to come into our office to rescue us, and we didn't tell the gunman . . . [the person in the chair] would get [his] first bullet. The gunman stood by that door with the gun aimed at my head for the entire time I sat in that chair."

On March 10 at about 7 p. m. Elsie Young untied herself and ran to safety when she saw Muzikir lay down his gun to move a desk into position for cover. Another hostage, John Cockrell, was released that evening after his hypertensive condition had worsened.

### 3. The Demands

Muzikir and Nuh continually repeated the same demands made by Khaalis at B'nai B'rith and by the three appellants at the

---

**10.** The physician who operated on Pierce testified that the forearm was grossly deformed as a result of the shattering of both bones in the forearm, and that his right hand and forearm

remained without function. The doctor stated that Pierce was completely paralyzed from the level of the lowest thoracic vertebra (the waist) down to his toes.

Islamic Center: they demanded that the murderers of the Hanafi family be delivered for execution, and that the movie about Mohammad be stopped.

On Thursday, Alan Grip called a radio or television station and repeated verbatim a statement given to him by Muzikir. The essence of the statement was "that we are all Hanafi Muslims. We are prepared to die. I am the son of Hamaas. This is not a personal grudge, and any attempt by the police to rush the room would put our lives and the lives of the hostages at B'nai B'rith in extreme danger."

### 4. Evidence of a Conspiracy

During the initial takeover at the District Building, Alan Grip asked Muzikir if the takeover there had anything to do with what was happening at the other buildings. Muzikir responded, "Yes," and then explained the relationship between the B'nai B'rith and the Islamic Center, as it related to the Muslim faith. Muzikir frequently referred to Khaalis as his father (in the spiritual sense, as there was no blood or marital relationship). Muzikir told the hostages that appellants felt the justice system had done nothing to avenge those persons who had killed and injured Khaalis' family. Alan Grip, hoping to get the women released, asked if the Hanafi religion did not teach them to respect women and children. Muzikir responded with statements about the murders and shootings of the Hanafi women and children and said that no one cared about them, so "why should we give a damn about the women here?"

At one point, the police shouted into the room the telephone numbers at B'nai B'rith and the Islamic Center and said that Hamaas wanted appellants' phone number at the District Building. Then, in the early evening of the first day, Nuh answered the telephone and was heard to say, "Yes, Hamaas; Yes, Hamaas." Then he vowed, "To the death, Hamaas, any time, any place, Hamaas." According to several hostages who testified Nuh regularly handled the telephone calls. After one call he told Muzikir, "We are to do nothing until we receive

further instructions from Hamaas." One witness testified that "on more than one occasion the man with the shotgun [Muzikir] said, 'If anything happened, if the police came, heads would roll at the Islamic Center and B'nai B'rith as well as the District Building.'"

### 5. Conclusion at the District Building

Early Friday morning, March 11, Muzikir spoke with someone on the telephone for the first time since the takeover. When asked by one of the hostages if they were to be released, Muzikir nodded affirmatively. The hostages heard a police officer refer to the negotiations and give directions that the hostages stay where they were and that the gunmen lay down their weapons in the doorway. Muzikir replied, "There's only one gun." Muzikir and Nuh stepped out and were arrested. The police rushed in to free the hostages.

The police recovered a number of weapons, all operable, from the fifth floor of the District Building. From room 507 they recovered a .12 gauge shotgun loaded with five live rounds of ammunition, several knives, two machetes, a curved sword, and a tote bag with 25 live rounds of .12 gauge ammunition. They recovered seven spent shells from inside the offices; six were identified as having been fired from the shotgun.

### D. Electronic Surveillance; Tapes played before the jury

During the trial, the government introduced evidence of nine conversations intercepted by emergency wiretaps placed upon the telephones at B'nai B'rith Headquarters. One of these conversations was not recorded because the monitoring equipment had not been properly connected. Officer Warren Hurlock, who had listened in on the call, related the substance of that conversation to the jury. The call was placed at 7:48 p. m. on March 9 from a telephone at B'nai B'rith to a telephone number at the District Building (established to be the phone that Muzikir and Nuh were using). A deep-voiced man at B'nai B'rith called

the party at the District Building and asked, "How many you got there, brother?" The party at the District Building stated, "I got eleven . . . ." The party at B'nai B'rith then stated, "Tie their hands and feet up and let them go to the bathroom one at a time!"

Tapes of the remaining eight telephone calls were played for the jury. One conversation was between Khaalis and Aziz, his son-in-law, at the family home. Khaalis asked Aziz, whether "they" had stopped the movie and Aziz responded affirmatively. Khaalis told Aziz: "And we're going to get the murderers too, you know that . . . or some heads are going to come out of here. . . . [I]f the murderers are more important than these people in here, then it doesn't matter to me." Khaalis asked, "Who is down there at the District Building?", referring (as Khaalis testified at trial) to the identities of the hostages.

In another recorded conversation between Khaalis and Police Chief Rabe, Khaalis demanded communications with the District Building. Rabe informed Khaalis that the money (which Khaalis believed was a fine for contempt of court) was on the way to his wife. Khaalis told Rabe that he would release any of the hostages who were badly harmed.

One call came into B'nai B'rith from Mark Elfin of WTOP radio. When asked, "Mr. Khaalis is this connected at all with the District Building . . . incident that's going on now," Khaalis responded, "It certainly is." Elfin asked "Those are your people also?" Khaalis responded, "That's right."

Another conversation took place between Khaalis and Mr. Dobkin of the Associated Press. Khaalis insisted on being identified as Hanafi Muslimans, and responded affirmatively when asked whether those at the District Building and the Islamic Center were with him.

The next conversation heard by the jury was a call from Penny Crone of ABC News in New York City. Khaalis repeated his demands about stopping the showing of the movie. He indicated that his actions were in defense of the faith, that Allah had granted them permission for retribution.

There was a phone call from Khaalis to his wife, Khadyja, in which she reported that all the city's traffic routes had been changed. Khaalis responded, "Well, I have all these high power rifles here, just I can just blast indiscriminately from sharp shooters[;] blow will be deadly."

The next tape played was a call from Khaalis at B'nai B'rith to the District Building, where an unidentified male answered.

Khaalis: They try to rush in there put the people in front of you.

A: Yes Hamaas.

Khaalis: You fight to the death.

A: Yes Hamaas.

Khaalis: You barricaded in there good.

A: Yes Hamaas.

Khaalis: Got your windows blocked out.

A: Windows blocked out, . . . yeah.

* * * * * *

Khaalis: . . . you keep the men tied hand and feet because there's only two of you there . . . you got a bathroom in there.

A: Yes Hamaas.

Khaalis: One man at a time and one woman at a time okay.

A: Yes.

Khaalis: Tell Muzikir, I said Islamic Mayhem [Islamic greeting].

* * * * * *

Khaalis: All right. Ismalomic Mayhem, we kill but we kill in the name of Allah you understand.

The next tape was of another call from Khaalis at B'nai B'rith to the District Building phone number. Khaalis was informed by an unidentified male that there were no problems at the District Building. Khaalis warned the man to "be extra on guard there . . . you fight to the death if you have to."

## E. *The Defense Case*

Appellants' counsel vigorously cross-examined the government's witnesses. They attempted to show that there had been no single, overriding conspiracy, and that Khaalis had entered the B'nai B'rith merely as a defensive religious measure to protest the showing of a blasphemous movie. Counsel tried to elicit that appellants had treated the men and women with compassion—that they had provided food, water, and medicine, and permitted them to use the bathroom. The defense tried to show that police gunfire had killed Maurice Williams and wounded Councilman Barry, Officer Cantrell, and Mr. Pierce. According to the defense, after negotiations, the men and women were voluntarily released and appellants surrendered peacefully. Appellants also surrendered their arms—admittedly enough (according to Khaalis' brief) for an "unholy massacre" of the entire police department, all the occupants of the three buildings, and perhaps many thousands of persons.

Khaalis took the stand on his own behalf. He described to the jury how he had returned home on January 18, 1973, to find his family brutally murdered and wounded. Since then, he had continually prayed to Allah for over a hundred hostages. "I asked Allah to let me expose the Zionist Jews who wrote the poisonous lessons that the so-called Black Muslims wrote." While in New York City in February 1977, approximately one month before the takeovers, he saw a theatre advertising the movie "Mohammad, Messenger of God," a movie which he considered totally sacrilegious. He expressed his beliefs to the jury: "in defense of the faith . . . [to] stand up and make a universal awareness that there are Muslims in the world who believe in their faith to the death." He "spoke to the brothers about it, and they also die for the faith. We stopped them for thirty-nine hours. . . . We stopped it by going to B'nai B'rith, which is one of the Zionist headquarters in this country. . . ."

Khaalis explained to the jury that his "own vindictiveness . . . which is ordered by the Koran . . . took second place to the picture." Under Islam, "when a capital crime has been committed against innocent victims, . . . you have the authority, and the law says that you can retaliate. Like a vendetta. You have the right to retaliate."

Khaalis admitted that on the morning of March 9, he directed Latif to obtain a U-Haul truck, and that the other appellants who went to B'nai B'rith were present when Khaalis and Latif loaded the ammunition and weapons onto the truck. Khaalis and Razzaaq rode to B'nai B'rith in a taxi while the other appellants went there in the truck. Khaalis stated that Rahman, Rahim, and Al Qawee (later at the Islamic Center) and Muzikir and Nuh (at the District Building) were not present when the truck was loaded.

Khaalis told the jury that he initially had freed seven persons at B'nai B'rith since he had vowed to Allah that he would let the first seven go because of the zealous work of the District police in capturing the killers of his family. He had ordered the remaining 100 or more hostages to be taken to the eighth floor and instructed his men to tie the men but not the women. He gave orders not to kill or harm anyone, that the takeover was a "purely defensive move." He generally denied knowledge of the assaults on the victims—the shooting, stabbing, and striking of various hostages. He insisted that he had not struck Charles Mason with a gun, claiming that the gun had slipped as he held it above Mason's head. Khaalis insisted that he had offered to release Henry Siegel if he felt *too* ill. Khaalis admitted, however, that as a "defensive" measure he had threatened that "if the demands were not met, heads would roll and old men would go first," and that he had warned the hostages that "this was a war, that innocent people die. . . ."

Khaalis testified about his conversations with Rahman at the Islamic Center and Nuh at the District Building. Khaalis told the jury that he had given orders not to

abuse anyone, "not to hurt anybody unnecessarily," not to tie up the women; he ordered his men to give the hostages medicine and food, and to permit them to use the bathroom. Khaalis admitted his disappointment that no city official had been caught at the District Building, because the attack on the District Building was designed to demonstrate the "insensitivity that we received when my family was slaughtered. . . . We never heard . . . one remark from no city official, when the most heinous, most brutalizing crime was committed here in this city. Nobody ever said—not one councilman, not one church leader, not one civil leader said one word. It was as if you had sprayed Black Flag on roaches in the kitchen. Nobody said nothing."

When the prosecutor asked Khaalis, on cross-examination, whether he had prayed that Dr. Rauf would be taken hostage, Khaalis replied: "That one day I would have to get him in a position where I could ask him some questions face-to-face [Nodding]."

Khaalis steadfastly maintained that there had been no plans other than that of Allah. He stated that Muzikir and Nuh had gone to the District Building with no specific instructions from him, "[o]nly from Allah." "There was no discussion. . . . It was destiny and fate." As to the B'nai B'rith takeover, Khaalis stated, "There was no discussion. Believe it or not, there was no discussion. Musliman just moves in the name of Allah." Khaalis maintained that Allah told him to go to B'nai B'rith and that Allah was letting him speak at trial, that "Allah directs everything, . . . the whole world. . . ."

The government, on cross-examination of Khaalis, asked:

Q: What was the goal in taking over the District Building?

A: To make the city aware the Hanafi Muslimans in this city were citizens of this country, not to be intimidated, harassed, ignored, when our children and women were shot up and slaughtered, and to make this city aware and sensitive that we are here to stay.

Q: What, sir, was the purpose in taking over the Islamic Center?

* * * * * *

A: The Islamic Center was because of the ignoring—Dr. Rauf totally ignoring the truth. He knew. He's Muslim. He knows the innovators are cursed by Allah. Yet he would play with them and deal with them. . . .

Q: Sir, with respect to the planning of the takeover of these three buildings on March 9th, did you make these plans with your eleven co-accused in this case?

A: There was no need to make any plans. There was no need. Allah was the plan.

Q: And they knew that as well as you did?

A: Certainly.

The government asked Khaalis:

Q: Did you know it was against the law to do what you were doing?

A: No. It had to be done.

When asked about the weapons brought to B'nai B'rith, Khaalis responded: "We were prepared to fight to the death. . . I was prepared to fight to the death . . . in the name of Allah."

### F. The government's rebuttal

In rebuttal, the government called Henry Siegel, who denied that Khaalis had offered him freedom: "The only thing that he ever offered me was to cut my head off." Siegel disputed other testimony of Khaalis. He stated that Khaalis had clubbed Charles Mason over the head with a pistol. After Mason had fallen unconscious and bleeding from the head, Khaalis ordered one of his guards "to tie Mr. Mason's hands which were already tied behind him to his ankles and have him face down on the ground." When asked about Khaalis' statements to the hostages, Siegel testified that Khaalis "had said that he and his men had all prayed to Allah before they came, that all said goodbyes to their family. They were prepared to die, and if we were smart—or wise—. . . we would do the same.

Pray and say goodbye to our family in any way we could, and also, pray to our own God. . . ."

We turn now to the merits.

## II. PREJUDICIAL PUBLICITY

Appellants maintain that prejudicial publicity before and during trial deprived them of their Sixth Amendment rights to a fair indictment and fair trial.

■ A. Specifically, with respect to the indictment, appellants contend that grand jury prejudice should be presumed from the extensive pretrial publicity. It is clear, however, that evidence of widespread publicity, standing alone, does not constitute a showing of prejudice. *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *Estes v. United States*, 335 F.2d 609, 613 (4th Cir. 1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). This argument, accordingly, has no merit.

■ Appellants also allege reversible error from the trial court's failure to question the grand jurors, or to allow appellants to do so, in order to assure an unbiased grand jury. In *Reed v. United States*, D.C. App., 383 A.2d 316, 322 (1978), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1979), we reviewed the appropriateness of challenges to grand juries for bias. We concluded that *United States v. Knowles*, 147 F.Supp. 19, 20–22 (D.D.C.1957), was dispositive, precluding such a challenge.

The qualifications of grand jurors are fixed by law. They relate to such matters as citizenship, residence, age, health, character, and ability to read, write, speak, and understand the English language. The accused may attack the legal qualifications of a grand juror, either by challenging an individual juror on the ground that the jury is not *legally* qualified, or by motion to dismiss the indictment because of a lack of legal qualifications of an individual juror.

Challenges for bias, or for any cause other than lack of legal qualifications, are unknown as concerns grand jurors. No provision is made for peremptory challenges of grand jurors and no such challenges are permitted. Likewise, no *voir dire* examination exists in respect to grand jurors. In other words, the status of a member of a grand jury may not be questioned except for lack of legal qualifications. [*Id.* at 20–21 (footnotes omitted) (emphasis in original).]

*See* Super.Ct.Cr.R. 6(b). Appellants have not challenged any grand juror's legal qualifications. The allegation of an unfair indictment accordingly fails.[11]

B. We turn to the alleged denial of a fair trial. Appellants contend, first, that the pretrial publicity was so widespread and fundamentally unfair that the jury's prejudice should be inferred from the circumstances, amounting to a violation of appellants' Sixth Amendment rights as a matter of law. They cite *Rideau v. Louisiana*, 373

---

11. The Supreme Court has left open the question whether constitutional due process requires the state to furnish an unbiased grand jury. *See Beck v. United States, supra* 369 U.S. at 546, 82 S.Ct. 955. The legislative history of Fed.R.Cr.P. 6(b)—the federal rule virtually identical to Super.Ct.Cr.R. 6(b)—indicates that the grand jury need not be impartial. The preliminary draft of the rule authorized a challenge for bias and prejudice, but the final draft dropped this provision. 4 W. Barron, Federal Practice and Procedure § 1892, at 44 (1951). This treatise writer concluded that such a challenge would be "wholly irrelevant and improvident in the case of members of the grand jury which prefers the charge and which of course should be scrupulously fair but not necessarily uninformed or impartial" (footnote omitted). *Id.*

Appellants' reliance on *United States v. Frumento*, 409 F.Supp. 136, 142–43 (E.D.Pa.1976), *aff'd*, 563 F.2d 1083 (3rd Cir.), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1977), is misplaced. There, the court suggested that a defendant might be entitled to a hearing to examine individual grand jurors about the effects of preindictment publicity if the defendant could proffer specific evidence of actual prejudice among the grand jurors, in addition to massive or prolonged publicity. *See also United States v. Bally Manufacturing Corp.*, 345 F.Supp. 410, 420–21 (E.D.La.1972). Appellants have made no such showing. Accordingly, even if *Frumento* states a preferred view of the law, it is inapposite here.

U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), in which the Supreme Court reversed a conviction on the ground that prejudicial pretrial publicity had made a fair trial impossible. There, the defendant's filmed confession had been televised three times to a community of 150,000 persons. Without examining the *voir dire,* the Court held that under these extreme circumstances, denial of the defendant's motion for a change of venue had violated due process.

■■■ We cannot agree that *Rideau, supra,* is dispositive. Appellants had sought widespread media coverage of their actions; Khaalis spoke with members of the press and the police during the siege. They cannot now complain that the very fact of the publicity they wanted interfered with their right to a fair trial. We note, in addition, that despite this publicity, the jury acquitted each of the appellants on several counts. *See United States v. Chapin,* 169 U.S.App. D.C. 303, 316, 318, 515 F.2d 1274, 1287, 1289, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). These facts demonstrate why a showing of pervasive, adverse pretrial publicity does not inevitably lead to an unfair trial. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Jones v. United States,* D.C.App., 386 A.2d 308, 316 (1978). Absent an extreme situation, therefore, as in *Rideau,* the Sixth Amendment inquiry must turn on the adequacy of the *voir dire. United States v. Haldeman,* 181 U.S.App.D.C. 254, 285 & n. 37, 559 F.2d 31, 62 & n. 37 (1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).[12]

We do not agree with appellants' view that *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), requires reversal on the basis of the *voir dire* here. In that case, the Supreme Court reversed a murder conviction not only because the prosecution issued a press release announcing that the accused had confessed to six murders but also because the appellant had proffered detailed evidence of a pattern of deep and bitter prejudice throughout the community, which had been "clearly reflected" in the *voir dire* examination of eight of the twelve jurors. The record here presents a markedly different situation. The jury selection process was careful and thorough, taking five full days. The court summoned and swore 650 persons, asked them to complete a questionnaire, and charged them to examine their consciences. The court sought to identify individuals who could sit on a sequestered jury for a trial estimated to last four to twelve weeks, without "extreme difficulty and hardship" (*e. g.,* leaving a sick person at home without care). The questionnaire also asked whether the prospective juror had ever been the victim of, or charged with, certain crimes. In addition, the questionnaire asked whether the respondent had read, seen, or heard anything about the case.[13] Those with knowledge of the case were asked whether they had formed a "fixed opinion" and, as a result, "would not be able to render a fair and impartial verdict." *See* note 13 *supra.* The court then used a computer analysis to select a prime group for individual *voir dire.*

The court had solicited written proposals from defense counsel for questions to be

---

12. All defendants joined in a motion to continue the trial date, in order to give sufficient time for defense preparation. A desire to permit pretrial publicity to abate was not cited. Although defendants filed a motion for change of venue, they withdrew it.

13. 2. (A) I have not read, seen or heard from any source, whether TV, radio, newspapers, magazines or word of mouth, anything about this case or the defendant in this case prior to what I have been told this morning.
(B) Although I have read, seen or heard through some source about this case or the defendant, I have *not* formed such a fixed

opinion or conviction about the guilt or innocence of the defendant that would prevent me from rendering a fair and impartial verdict according to the evidence received at trial and the instructions of law which the Court will give.
(C) I *have* such a fixed opinion or conviction about the guilt or innocence of the defendant as a result of what I have read, seen or heard, and I believe that as a result of this I would not be able to render a fair and impartial verdict according to the evidence received at trial and the instructions of law which the Court will give.

asked on *voir dire*.[14] Before questioning began, the court discussed the questions with defense counsel and the prosecutors. Thereafter, during individual *voir dire,* the court asked the questions, focusing on each person's exposure to the case. For example: What were the sources of your information? Would the fact that you had discussed the incident with others, read about it, and seen reports on television prevent you from rendering a fair and impartial verdict? Did you follow the events very closely, routinely, casually, or hardly at all? Would your exposure prevent you from being fair and impartial? Did you ever overhear the broadcast conversations between radio and television personnel and the Hanafi Muslims inside the District Building, the Islamic Center, and B'nai B'rith? Were you aware of the demands made by the accused as a condition of their surrender? Did you read or hear interviews of the so-called hostages involved? Have you ever heard anyone express an opinion as to the guilt or innocence of the accused? Did you participate in any prayer meetings centered around the events of March 9–11, 1977? Depending on the responses given to these and other questions, the court would ask whether the prospective juror felt unable to render a fair and impartial verdict, based on the evidence.

Although the *voir dire* revealed that a majority of those questioned had followed the news coverage only routinely, the court excused a number of prospective jurors for reasons relating to pretrial publicity.

 In challenging this process, appellants contend that the trial court improperly limited the questions asked of prospective jurors. We disagree. The law affords the trial court broad discretion in conduct-

ing *voir dire* examination; absent an abuse of discretion and substantial prejudice to the accused, the trial court will be upheld. *Coleman v. United States,* D.C.App., 379 A.2d 951, 954–55 (1977); *United States v. Liddy,* 166 U.S.App.D.C. 95, 101–04, 509 F.2d 428, 434–37 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975); Super.Ct.Cr.R. 24(a).

While conducting a thorough *voir dire,* the court was properly concerned about moving the process along, in order to empanel and sequester a jury without unduly exposing the jury array to publicity during this phase of the proceeding—to the ultimate prejudice of appellants. The court therefore invited counsel to make brief objections, which could be supplemented in writing; but once the court was satisfied that a prospective juror could be impartial, it had discretion to terminate the questioning—and it did so. We conclude, accordingly, that appellants have made no showing which would support a finding of abuse of discretion or prejudice. To the contrary, the court's *voir dire* procedure reflects a most careful concern for appellants' right to a fair trial.

 C. Appellants also assert that the trial court failed to assure that the jury was protected from prejudicial publicity during trial. Again, the record does not support their claim. The jury was sequestered immediately upon its selection, and the court instructed the jury not to read about or discuss the case. The court appears to have done everything in its power to minimize the effect on the jury of publicity. Appellants have cited no instance when the sequestered jury was affected by publicity during the trial.[15]

 D. Finally, appellants claim that the means used to restrain them during

---

14. The questions proposed by defense counsel included whether anyone was a member of the Islamic faith; whether anyone was a member of the Black Muslims; whether anyone was, or had a close relative who was, a member of the Jewish faith, whether the prospective juror would feel a personal antagonism against the defendants if the government introduced evidence of bias against the Jewish faith; whether anyone was a contributor to or member of B'nai B'rith; whether anyone had seen the

movie "Mohammed, Messenger of God." Some of these questions were ultimately asked depending on the prospective juror's responses to more general questions.

15. Appellants argue that the trial court abused its discretion in failing, *sua sponte,* to sequester witnesses during trial. *See* Super.Ct.Cr.R. 53(d). Appellants did not make a Rule 53(d) motion. We find no abuse of discretion here.

trial—shackling and surrounding them with armed guards—was a violation of due process in that it negated the presumption of innocence. It is significant, however, that appellants did not object at any time to this method of security; thus, the plain error rule requires that the matter complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *Johnson v. United States*, D.C.App., 387 A.2d 1084, 1089 (1978) (en banc); *Watts v. United States*, D.C. App., 362 A.2d 706 (1973) (en banc).

We do not find such plain error here. If appellants were concerned about their appearance before the jury, they had ample opportunity to object to the security measures before or during trial. "[T]he failure to make an objection to the court . . . for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation," *Estelle v. Williams*, 425 U.S. 505, 512–513, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976) (constitutional due process precludes the state from compelling an accused to stand trial before a jury dressed in identifiable prison clothing, but failure to object negates the inference of compulsion).

Appellants' Sixth Amendment claim based on prejudicial publicity before and during trial accordingly fails.

## III. INTERFERENCE WITH DEFENSE EFFORTS TO INTERVIEW GOVERNMENT WITNESSES

Appellants filed a pretrial motion to dismiss the indictment, based on the actions of

Alan Grip—one of the hostages at the District Building—who had cancelled an appointment to be interviewed by defense counsel.[16] The trial court conducted a pretrial hearing. *See Gregory v. United States*, 125 U.S.App.D.C. 140, 143, 369 F.2d 185, 188 (1966) (a prosecutor's actions which "effectively deny[] defense counsel access to the [government] witnesses except in his presence" violate due process), *after remand*, 133 U.S.App.D.C. 317, 410 F.2d 1016, *cert. denied*, 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969).

At this hearing,[17] Grip testified, on direct examination, that after he had agreed to meet with defense counsel King, *see* note 16 *supra*, he telephoned prosecutor Linsky to ask three questions: (1) whether the law obligated him to speak with defense counsel (Linsky answered that there was no such obligation), (2) whether it would damage the government's case if Grip declined to speak with any defense attorney (Linsky replied no), and (3) whether Grip should seek advice from an attorney (Linsky said that this would be a good idea). Thereafter, Grip consulted with an attorney, who advised that it would not be in Grip's best interest to speak with defense lawyers. Grip further testified that no member of the United States Attorney's Office had ever advised him not to talk with defense attorneys or investigators.[18] On cross-examination, Grip testified that

I had second thoughts about talking to defense attorneys and because I did I felt

16. Appellants supplied an affidavit from John King, Esquire, counsel for Rahman before trial, stating that on March 21, 1977, King had happened to meet Grip, who agreed to an interview. During a telephone conversation on April 12, 1977, Grip agreed once again to meet with King. On April 13, however, prosecutor Linsky informed King that Grip would refuse to speak with him. On April 18, Grip broke the appointment during a telephone conversation and thereafter declined to speak with defense counsel.

17. Appellants contend that the trial court abused its discretion in refusing to exclude one of the prosecutors, Mr. Linsky, from the courtroom while Alan Grip testified. We disagree. Defense counsel O'Keefe told the court that the

defense did not anticipate calling Linsky, although "it may be necessary for him to testify." If they had been truly worried about Mr. Linsky's integrity on the stand, appellants presumably could have called him as the first witness. As it turned out, the defense did not call him at all. There was no abuse of trial court discretion here. *Matthews v. United States*, D.C.App., 267 A.2d 826, 829 (1970), *cert. denied*, 404 U.S. 884, 92 S.Ct. 221, 30 L.Ed.2d 166 (1971).

18. Grip and other potential government witnesses received a letter from the prosecutors which stated, in part, as follows:

Recently, we have received several calls from witnesses inquiring as to their rights

that I should get some legal advice about whether or not I should.[19]

Later, the following colloquy took place:

MR. HOGE [counsel for Rahman]: Did you have an impression that Mr. Linsky or Mr. Tuohey or anybody else associated with the government would prefer that you not talk to any of the defense counsel or the investigators?

GRIP: I never got that impression one way or the other.

MR. HOGE: On the other hand, even though you didn't have that impression from Mr. Tuohey or Mr. Linsky, you decided not to talk to defense lawyers and investigators but to talk to the media. Is that correct?

GRIP: That's correct.

Appellants contend that they are entitled to a new *Gregory* hearing because the trial court unduly restricted cross-examination during the first inquiry. Specifically, they complain that the trial court improperly sustained the government's objection to cross-examination about Grip's willingness to speak about the takeover to members of the news media.[20] Defense counsel had explained, to no avail, that he was attempting to establish that Grip had been willing to talk with the media but not the defense, and that "justice under the *Gregory* case requires a close examination of his reasons for discriminating between the two." Counsel, in other words, was attempting to establish in any possible way that the prosecutors had blocked access to a government witness.

▪ We do not agree with appellants' contention. This court has held, apropos of *Gregory*, that due process is not violated when government "witnesses for private reasons and absent government interference refuse to discuss the case with defense counsel." *United States v. McDougald*, D.C.App., 350 A.2d 375, 378 (1976). The government established, through direct and cross-examination, that the prosecution had not directed Grip to refuse to speak with the defense attorneys; nor had the prosecutor otherwise interfered with defense access to Grip. The court permitted extensive cross-examination as to the prosecutors' actions.[21] In fact, two counsel were permitted a second round of questions. Given such thorough inquiry into the government's actions, coupled with Grip's unshaken testimony that he perceived no government interference, we agree with the trial court's ruling that the defense effort to inquire into Grip's contacts with the media was irrelevant to the *Gregory* inquiry; it was directed instead to Grip's "private reasons" for declining to

should a defense attorney or defense investigator contact them. If you should be contacted by any one, other than law enforcement officials or members of this office, you may discuss the case with them if you wish but you have an absolute right to refuse to do so. If you elect to make a statement, you have a right to request that you be furnished with a copy thereof. With respect to inquiries by the press or media, we would encourage you not to discuss the case with members of the press since you are a potential witness in a criminal case and the rights of the Government and the defendant to a fair trial could be jeopardized by such pre-trial publicity. We ask you to use your best judgment in this matter and if there are any questions whatsoever, please do not hesitate to contact us.

Appellants maintain that this letter, on its face, is one-sided and thus coercive. We disagree. Given the large number of witnesses and the obvious questions many of them would have about speaking with representatives of the defense and the news media, a letter of this sort was an efficient, uniform and—as we read it—non-coercive way of responding to the situation. Alan Grip, for example, confirmed unequivocally that he did not feel coerced by the prosecution, through the letter or otherwise.

19. This answer was in direct response to this question: "What was it that made you determine that you should call Mr. Linsky concerning this appointment that you had with Mr. King?"

20. Counsel had asked: "During that time, during the week between the end of the incident and your conversation with Mr. King did you have occasion to talk to any members of the news media concerning the case?"

21. Seven defense attorneys cross-examined Grip at length about the prosecutors' actions; the remaining counsel either had deferred to the others or indicated that their questions had been asked.

speak with defense counsel. *McDougald, supra* at 378.

Understandably, defense counsel must have felt frustrated by the unwillingness of government witnesses to speak with them. After two months of effort, the twelve defense lawyers and twelve investigators had been able to obtain a statement from only one witness, while many of the hostages who were later to testify at trial had given extensive interviews to the media. Counsel, therefore, attempted to use the *Gregory* hearing to discover whatever they could, to the point of asking repetitious [22] —and occasionally argumentative [23]—questions.

Near the end of the hearing, the trial court granted defense counsels' request for additional argument concerning their rea-

sons for objecting to the court's rulings on the propriety and admissibility of defense questions. Counsel argued that they wanted to test Grip's "credibility." The prosecutor emphasized once again that Grip's personal motives for talking with the press but not defense counsel were irrelevant to the *Gregory* issue.

We conclude, on the basis of *McDougald, supra* at 378, that the trial court properly limited cross-examination of Alan Grip during the *Gregory* inquiry. We reject appellants' request for another hearing; their rights were protected by the first one.[24]

## IV. ADMISSION OF EMERGENCY WIRETAP EVIDENCE

The United States Attorney, pursuant to D.C. Code 1973, § 23–548(a),[25] authorized

**22.** For example, appellants contend that the trial court erred in sustaining a particular government objection:

> MR. HOGE: At the time that you talked to Mr. King, did you intend to talk to him about the incident to which you were a witness?
> MR. TUOHEY: Objection, Your Honor. The witness has already answered the question.
> THE COURT: Sustained.

Mr. Hoge explained that the fact Grip had testified on direct examination that he had made an appointment with King did not necessarily mean he had intended to talk to him about this case. The court replied that "[t]he testimony is there." Appellants nevertheless argue that the witness had not answered that question. The record shows, however, that Grip earlier had answered the thrust of that question:

> [MR. TUOHEY]: What, if anything, did Mr. King ask you when he called?
> GRIP: He asked me if he could arrange a meeting with me to discuss the case. He represented himself as one of the defendant's attorneys and he asked me if I would meet with him to discuss the case.

**23.** Counsel for Khaalis was cross-examining Grip, who had testified that the prosecutor had never informed him about the possible consequences of the *Gregory* motion (to dismiss the indictment), and that if he had read the caption on the motion, "it didn't make an impression on me." Counsel began to argue with Grip; he persisted, over five sustained government objections, in asking whether Grip's use of the words "it may have" and "I don't believe" and "I don't recall" indicated that the prosecutor had told him "that is a way out" (from telling the truth).

**24.** Appellants also argue that the trial court should have granted their motion for a *voir dire* of each government witness, before he or she took the stand, to explore reasons for not speaking with defense attorneys or investigators. The court properly refused this request. Other than its contentions with respect to Alan Grip, the defense had proffered no evidence that the government had interfered with defense access to witnesses, in violation of *Gregory, supra*.

**25.** D.C. Code 1973, § 23–548(a) provides in part:

> (a) Notwithstanding any other provision of this subchapter, any investigative or law enforcement officer, specially designated by the United States attorney for the District of Columbia, who reasonably determines that—
> (1) an emergency situation exists with respect to conspiratorial activities characteristic of organized crime that requires a wire or oral communication to be intercepted before an order authorizing the interception can with due diligence be obtained, and
> (2) there are grounds upon which an order could be entered under this subchapter to authorize interception,
> may intercept the wire or oral communication if an application for an order approving the interception is initiated in accordance with this section within twelve hours and is completed within seventy-two hours after the interception has occurred, or begins to occur. In the absence of an order, the interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. . . .

emergency wiretaps on telephones located at B'nai B'rith headquarters, the District Building, and the Islamic Center. The trial court denied appellants' motions to suppress, holding that they lacked standing to challenge the electronic surveillance. In the alternative, the court held that the government had fully complied with § 23–548(a), and that the statute was constitutional. Appellants now challenge the admission into evidence of taped telephone conversations at the first two locations during the takeover.[26]

■ A. Even before *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), it was clear that trespassers did not have standing under the Fourth Amendment to contest a search of the premises they wrongfully occupied. *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Brooks v. United States*, D.C.App., 263 A.2d 45 (1970); *United States v. Gregg*, 403 F.2d 222 (6th Cir. 1968), aff'd, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442, *rehearing denied*, 395 U.S. 917, 89 S.Ct. 1738, 23 L.Ed.2d 232 (1969). In *Rakas, supra*, while confirming that "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search," *id.* 99 S.Ct. at 429 n. 9, the Supreme Court merged the question of standing into the substantive question "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained." *Id.* at 429.[27] The inquiry then becomes, more specifically, "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* The scope of that interest is determined by whether one can be said to have "a legitimate expectation of privacy in the invaded place." *Rakas, supra* at 430; *see Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This "means more than a subjective expectation of not being discovered," *Rakas, supra* 99 S.Ct. at 430 n. 12; it must be "'one that society is prepared to recognize as "reasonable".'" *Id.* The court thereupon held, 5 to 4, that automobile passengers, in contrast with the owner, did not have a constitutionally protected interest—a legitimate expectation of privacy—against a search of the glove compartment and under the front seat.[28]

■ All the more so, the appellants here—who forcibly took over B'nai B'rith headquarters, the District Building, and the Islamic Center without permission and held hostages for several days—cannot have had a legitimate expectation of privacy, protected by the Fourth Amendment, against seizure of their telephone conversations by electronic surveillance on the premises. Nor, in any event, did appellants have any such subjective expectation. *See Smith v. Maryland*, —— U.S. ——, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). The conversations took place in the presence of one of the hostages, Mrs. Betty Neal, who placed calls and answered the telephone for Khaalis. Khaalis himself testified before the jury that he was aware the telephones were tapped. Khaalis intended to—and did—make his demands public, in part through these telephone conversations, which were calculated to attract the attention of the media, the police, and the public. *Cf. Katz v. United States, supra*, 389 U.S. at 351, 88 S.Ct. at 511 ("[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection"). Appel-

---

**26.** All the appellants except Razzaaq, Shaheed, Salaam, and Hamid moved to suppress the intercepted conversations. The substance of the conversations is summarized in Part I.D. *supra*.

**27.** The "Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive

Fourth Amendment law than within that of standing." *Id.* at 428.

**28.** In converting the inquiry from "standing" to one's personally protected Fourth Amendment rights, the Court in *Rakas, supra*, rejected the test in *Jones, supra*, that "anyone legitimately on premises where a search occurs may challenge its legality." *Id.* 362 U.S. at 267, 80 S.Ct. at 734.

lants have no privacy interest and thus no constitutional claim to assert.

B. The question remains whether admission of the taped conversations into evidence violated appellants' statutory rights under D.C. Code 1973, § 23–548(a). *See* note 25 *supra*. The threshold question, once again, is standing. D.C. Code 1973, § 23–551(b) provides that "[a]ny aggrieved person . . . may move to suppress the contents of any intercepted wire or oral communication. . . ." D.C. Code 1973, § 23–541(9) defines an "aggrieved person" as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."

In *Alderman v. United States*, 394 U.S. 165, 175–76 & n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court interpreted the virtually identical federal provision defining "aggrieved person," 18 U.S.C. § 2518(10) (1976), to conform to the standing rules governing constitutional claims. *See* S.Rep.No.1097, 90th Cong., 2d Sess. 91, 106 (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2163, 2179–80. Later, in *Rakas, supra*, the Court reaffirmed its holding in *Alderman, supra*, which interpreted the Fourth Amendment standing rules and § 2518(10) interchangeably: "persons who *were not parties* . . or who *did not own* the premises on which such conversations took place did not have standing to contest the legality of the surveillance, regardless of whether or not they were 'targets' of the surveillance." *Rakas, supra*, 99 S.Ct. at 427 (emphasis added).[29] *See also United States v. King*, 478 F.2d 494, 506, *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973). We perceive no basis for interpreting the District of Columbia statute differently from its federal analogue. Thus, with the possible exception of Khaalis and Nuh—the only appellants who were parties to an intercepted conversation—it is clear that appellants lack standing to make a statutory challenge.

The next question, therefore, is whether Khaalis and Nuh have standing by virtue of the language of D.C. Code 1973, § 23–541(9), defining an "aggrieved person," in the first instance, as one "who was a party to any intercepted wire or oral communication." We hold that they do not.

In enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.*—the federal analogue of the District of Columbia wiretapping statute—Congress intended to codify the extent to which wiretapping and electronic surveillance are permitted by the Fourth Amendment. *United States v. Baldassari*, 338 F.Supp. 904, 905 (M.D.Pa.1972); *see Kinoy v. Mitchell*, 331 F.Supp. 379, 382 (S.D.N.Y.1971). The legislative history

> states specifically that the procedure was intended to conform to the constitutional standards enunciated in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). [*United States v. Baldassari, supra* at 905.]

Thus, Congress did not intend to confer a greater right to suppress evidence derived from wiretapping or electronic surveillance than the Constitution guarantees. *See Alderman, supra*.

Although the Supreme Court in *Alderman, supra*, 394 U.S. at 176, 89 S.Ct. 961, expressly confirmed a person's standing to challenge electronic eavesdropping of conversations to which he or she was a party, or which took place on his or her own premises, that decision did not involve trespassers. The "existent standing rules," *id.* at 175–76 & n. 9, 89 S.Ct. 961, which underlay—and thus limited—the definition of "aggrieved person" were, at the time, derived from *Jones, supra*, which did not extend standing to persons who wrongfully occupied the premises searched. Accordingly, if Congress intended to codify Fourth Amendment rights in Title III, the premise

---

**29.** The Supreme Court accordingly construed the second criterion of § 2518(10)—"a person against whom the interception was directed"— to mean a person with an ownership interest in the premises. *Alderman, supra*.

underlying the standing of "a party to any intercepted wire or oral communication" is that the party is legitimately on the premises. In short, if Title III were at issue, Khaalis and Nuh, as trespassers, would have no greater standing than the other appellants.

Because the District of Columbia statute is virtually identical to Title III and has no legislative history that would warrant a different interpretation, we hold that Khaalis and Nuh are not "aggrieved persons" under D.C. Code 1973, § 23–551(b).[30] Accordingly, the trial court did not err in denying appellants' motion to suppress evidence of the taped telephone conversations.[31]

## V. DENIAL OF A MULTIPLE CONSPIRACY INSTRUCTION

Appellants contend that their convictions for conspiracy to commit kidnapping while armed (Count I) should be reversed because of the trial court's failure to give, at their request, a multiple conspiracy instruction.[32] The argument, more specifically, is this: (1) the court instructed the jury with respect to Count I, which charged a single conspiracy; (2) there was sufficient evidence for another instruction permitting the jury, in the alternative, to find up to three conspiracies—defined by reference to each building seized—rather than one, all-encompassing conspiracy; (3) in the event that the jury found one or more smaller conspiracies, appellants would be entitled to acquittal under Count I, although the "variance" princi-

ple would not necessarily have precluded conviction for the lesser conspiracy in which a particular appellant may have participated;[33] (4) it was therefore reversible error for the trial court to deny appellants' requested instruction and bar them from arguing that issue to the jury.

Perhaps the most commonly expressed basis for granting a defense request for a special instruction occurs when a defendant admits one or more essential elements of the offense but attempts to carry the burden of proving circumstances which would excuse the act, including accident, self-defense, and defenses bearing on intent such as claim of right, insanity, or intoxication. *See, e. g., Rhodes v. United States*, D.C. App., 354 A.2d 863, 864 (1976); *Williams v. United States*, D.C.App., 337 A.2d 772, 774 (1975); *(Curtis) Smith v. United States*, D.C.App., 330 A.2d 519, 521 (1974); *(Charles) Smith v. United States*, D.C.App., 309 A.2d 58, 59 (1973); *Grigsby v. Commonwealth*, 299 Ky. 721, 187 S.W.2d 259 (1945); *Gibson v. Commonwealth*, 204 Ky. 748, 265 S.W. 339, 344 (App.1924). In such situations, the defendant will be "entitled to an instruction on any issue 'fairly raised by the evidence.'" *(Charles) Smith, supra* at 59 (quoting *Womack v. United States*, 119 U.S. App.D.C. 40, 336 F.2d 959 (1964)).

But even more broadly—when a defendant admits nothing—he or she may be entitled to an instruction incorporating a theory of the case, most commonly a lesser-included offense, provided that there is "some evidence which tends to bear upon

---

**30.** In *Rakas, supra*, 99 S.Ct. at 428, the Supreme Court built upon language in *Alderman, supra*, suggesting that Fourth Amendment rights are "personal in nature"—that only the person whose rights are violated can claim protection under the Fourth Amendment, not someone else who is implicated by an unlawful wiretap. From this it was a short step to *Rakas'* holding that the questions of standing and substantive rights merge under the Fourth Amendment, and that the question in every case is whether the moving party had a "legitimate expectation of privacy." *Id.* at 430; *see* note 27 *supra*. Because Title III—and the District of Columbia statute—are not intended to confer rights beyond those guaranteed by the Constitution, the Court's decision in *Rakas* re-

inforces our statutory interpretation that Khaalis and Nuh cannot be considered "aggrieved persons."

**31.** We therefore need not reach the questions whether the statute is constitutional and the government complied with it.

**32.** Count I of the indictments charged appellants with conspiracy to commit kidnapping while armed at B'nai B'rith headquarters, the District Building, and the Islamic Center. D.C. Code 1973, § 22–105a.

**33.** *See, e. g., Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

that issue," *Stevenson v. United States,* 162 U.S. 313, 315, 16 S.Ct. 839, 840, 40 L.Ed. 980 (1896). *Accord, Day v. United States,* D.C. App., 390 A.2d 957, 961–62 (1978); *Pendergrast v. United States,* D.C.App., 332 A.2d 919, 924 (1976); *Bailey v. District of Columbia,* D.C.App., 281 A.2d 440, 442 (1971); *Belton v. United States,* 127 U.S.App.D.C. 201, 206, 382 F.2d 150, 155 (1967).

Appellants' request for a multiple conspiracy instruction is akin to both categories of cases where special instructions are given; it is an attempt both to excuse responsibility for some of the acts (for which, as is undisputed, there is substantial evidence) by disavowing the required intent for an overall conspiracy, and to achieve findings of lesser culpability by narrowing the scope of any conspiracy and its related criminal acts. Their right to the instruction, therefore, turns on whether the multiple conspiracy issue is " 'fairly raised by the evidence,' " (*Charles*) *Smith, supra; Womack, supra* —whether there is "some evidence" tending to support appellants' theory. *Stevenson, supra,* 162 U.S. at 314, 16 S.Ct. 839.

No one disputes that there is substantial evidence to support the single conspiracy charge in Count I. Appellants attacked the three buildings in similar fashion; they took hostages at all three sites; appellants warned that if the police moved into any of the three locations, hostages would be killed at each; throughout the siege, Khaalis was in telephone contact with appellants at all three buildings and acted as spokesman for all; appellants at all sites made the same demands; and, upon Khaalis' final order, they all released their hostages and surrendered simultaneously.

■ In contrast, the inferences which appellants argue in support of their multiple conspiracy theory—the disparity in the amount of weaponry and ammunition at the three sites, a difference in the quality of the attack ("sloppiness" at the District Building compared with "military precision" at B'nai B'rith), and the fact that Muzikir and Nuh assaulted the District Building after hearing news over the radio about the other two takeovers—do not constitute sufficient evidence for a multiple conspiracy instruction.[34] On this record, therefore, we cannot say that a multiple conspiracy issue is fairly raised by the evidence—that the evidence "tends to bear upon" appellants' claim here. *Stevenson, supra* at 315, 16 S.Ct. 839.[35]

■ The fact that the jury found all the appellants guilty of a single conspiracy, as charged, but only guilty of the substantive offenses at the buildings where they were, does not militate against this conclusion. Juries are permitted to return inconsistent verdicts. *See, e. g., Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Steadman v. United States,* D.C.App., 358 A.2d 329, 332 (1976). We cannot permit speculation about the jury's reasons for its verdicts to influence

---

34. The court, in its final instructions, informed the jurors that they could listen to the tapes and view exhibits if they so desired. The jury later did request to hear the tapes and to have the court repeat the instructions on conspiracy. At a bench conference on this issue, defense counsel objected to the tapes being played out of chronological order, and asked the court to give the jury the times of the tapes. The court responded that the jury had only asked for the tapes to be replayed, and that if they later asked for the times they could have them. The tapes were replayed. The next day, the jury requested the times of the recorded conversations. The court, over defense objection, refused to give the times, stating that defense counsel had not stipulated to the times, and that this, accordingly, was an issue of credibility for the jury. It instructed the jury: "There was

testimony as to the times. Your best recollection of the testimony controls." We find no abuse of discretion.

35. In reaching this result we do not adopt the government's argument that a "higher threshold" of the evidence is required before granting an instruction on the multiple conspiracy theory, in contrast with other theories of a defense case. We apply the same test used in other contexts. Thus, we reject the rule in *United States v. Kirk,* 534 F.2d 1262, 1269–72 (8th Cir. 1976), *cert. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1978), that when there is substantial evidence of a single conspiracy, the court need not instruct the jury as to multiple conspiracies.

our analysis of the extent of the evidence supporting a multiple conspiracy theory.

In conclusion, there was no error here.

## VI. CURTAILMENT OF CROSS–EXAMINATION

Eight appellants [36] argue that the trial court, in curtailing cross-examination of Rabbi Fishman, violated their Sixth Amendment right to confront witnesses, as well as their right to due process.

Counsel sought to cross-examine Rabbi Fishman about appellants' reactions to Khaalis' instructions during the takeover and siege, hoping to establish that they responded "unhesitatingly and automaton-like"—and thus lacked the specific intent required for the conspiracy count. More specifically, according to their brief:

If the followers responded reflexively, without exercising independent judgment to each and every command, then a serious question as to their mental state in terms of specific intent is raised.

They claim, additionally, that in showing through questions of Rabbi Fishman that the takeover was military-like, they could have demonstrated that they acted only on a "need to know basis" and therefore lacked knowledge of the essential nature of the conspiracy.

Recently, this court summarized the law applicable to cross-examination:

Although the right to cross-examine is . . . inherent in the Sixth Amendment right to confrontation, "[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). Some meaningful degree of cross-examination must be allowed in the first instance in order to comply with the Sixth Amendment's command in this re-

gard. The question of the degree to which the powerful tool of cross-examination must be permitted beyond that point cannot be reduced to a definitive abstract formula, but rather must be evaluated in light of the specific circumstances presented by each case. *United States v. Houghton*, 554 F.2d 1219 (1st Cir. 1977). [*Springer v. United States*, D.C.App., 388 A.2d 846, 854 (1978).]

Therefore, we must consider, first, whether the Sixth Amendment concerns have been satisfied here and, if so, whether the trial court nonetheless abused its discretion in the limits it imposed on the cross-examination of Rabbi Fishman.

■ It is clear from the record that the trial court did not commit constitutional error. Appellants were permitted to cross-examine the rabbi extensively about the only subject of his testimony—in-court identifications—and were allowed to establish through his testimony that Khaalis was the leader of the takeover at B'nai B'rith. They had ample opportunity to challenge his credibility, and there is no claim that the trial court unduly restricted appellants' effort to demonstrate bias. *See Springer, supra* at 854–57.

■ Nor did the trial court abuse its discretion. *See Morris v. United States*, D.C.App., 389 A.2d 1346 (1978). As already indicated, the court sustained objections by Khaalis to questions intended to establish the existence of a "military-type" operation, as well as to show appellants' reactions to Khaalis' instructions. The court deemed the first too broad, the latter irrelevant. In light of substantial evidence that all the appellants were aware of the overall objectives of the conspiracy, the fact that appellants may have followed Khaalis' orders without question or comment is of marginal, if any, relevance to the issue of specific intent.[37]

---

36. Rahim, Nuh, Shaheed, Al Qawee, Latif, Hamid, Muzikir, and Rahman.

37. The trial court underscored the irrelevance of this line of questioning by pointing out that appellants had not raised an insanity defense.

If, on the other hand, appellants were suggesting a defense of "diminished capacity," the questions were irrelevant because that defense is not recognized in this jurisdiction. *Bethea v. United States*, D.C.App., 365 A.2d 64, 83–92 (1976) *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979,

■ In any event, the government called Rabbi Fishman to the stand only to identify the appellants who were present at B'nai B'rith headquarters, to identify those who were armed, and to testify generally about the early stages of the takeover at B'nai B'rith. There were no questions about the appellants' respective roles in the seizure. Accordingly, the effort to establish through Rabbi Fishman that all appellants but Khaalis were "automaton-like"—that they lacked specific intent—was beyond the scope of the direct examination, and thus properly curtailed for that reason. *(Curtis) Smith v. United States, supra* at 520.

## VII. PROSECUTORIAL MISCONDUCT

■ Appellants contend that the prosecutors' conduct during jury *voir dire,* examination of witnesses, and closing argument to the jury was inflammatory and prejudicial, violating their constitutional right to a fair trial. In *Villacres v. United States,* D.C.App., 357 A.2d 423, 428 (1976), we summarized the standard of review to be applied here:

> The applicable test in this jurisdiction in determining whether prosecutorial misconduct infects a verdict is to balance, on the one hand, the gravity of the misconduct, its direct relationship to the issue of innocence or guilt, and the effect of specific corrective instructions by the trial court, if any, against the weight of the evidence of appellant's guilt. [Citations omitted.]

See *Johnson v. United States,* D.C.App., 386 A.2d 710, 713 (1978); *Jenkins v. United States,* D.C.App., 374 A.2d 581, 584–85, *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977). Appellants cite 104 instances of prosecutorial misconduct—to which we now turn.[38]

### A. Jury Voir Dire

Appellants claim that the government's presentation of the family of Maurice Williams (the reporter killed at the District Building) to the jury array was irrelevant, calculated to evoke sympathy, and thus a basis for reversible error.[39] Appellants stress that the situation was further inflamed by presentation of the family as a group, rather than individually as the other witnesses were presented. The government replies that the introduction of the Williams family was brief and that it served the legitimate function of determining not only whether the prospective jurors were acquainted with the family but also whether they were likely to be prejudiced later, as jurors, upon hearing about Maurice Williams' death. The government points out that two prospective jurors later approached the court and were excused because, after seeing the Williams family, they felt they would be prejudiced against the accused.[40]

■ We cannot say on this record that the prosecutors' actions amounted to misconduct.[41] Although it is possible that more

53 L.Ed.2d 1095 (1977); *see Jones v. United States,* D.C.App., 386 A.2d 308, 312 (1978). At oral argument, counsel stated that there was a third possibility: absence of specific intent due to lack of knowledge. As indicated in the text above, however, there was substantial evidence of appellants' knowledge of the conspiracy, making their attempted inquiry of Rabbi Fishman marginally relevant.

38. Appellants allege a total of 313 instances of prosecutorial and judicial misconduct. *See* Appendix A to the brief for Khaalis and Adam. Of the 313, we count 104 assignable against the prosecution, of which 65 implicate the court as well. *See* Part IX *infra.* With respect to the large number of these which can be dealt with summarily by category, we do not discuss details; instead, for the parties' reference we cite to the numbers (hereafter following "# s")

which appellants themselves have assigned in Appendix A.

39. # s 16, 19, 21, 26, 27, 29, 30.

40. Tr. 773–774.

41. Mr. O'Brien, counsel of Al Qawee, objected to what he perceived as the *ex parte* nature of the decision to present the Williams family as a group to the jury array. "I would like my objection to be noted to ex-parte communication between the court and the government. I have seen two instances of it this morning." The first "was the handing of a piece of paper of names to the Court. Counsel was not permitted to see it." The court responded: "All right." The colloquy continued:

> MR. O'BRIEN: The second objection—and I cannot prove this happened, but I can only

than the prospective jurors who asked to be excused could have been influenced against the appellants upon seeing the Williams family, it is just as likely that the government's point is well taken—that those likely to be affected to the point of prejudice were discovered. If it were true, as alleged, that there were *ex parte* communications between the prosecution and trial court about presentation of the Williams family, *see* note 41 *supra,* then we would find impropriety; but this could not be translated into the kind of error requiring reversal, since it is *too* speculative to say that the court would have ruled against presentation of the family, after a hearing—assuming that such a ruling would have been warranted.

■ Appellants cite another incident during the individual *voir dire* of a prospective juror, claiming "prosecutorial misconduct in accusing defendants of being biased against people of Jewish faith." [42] Defense counsel asked to strike for cause a prospective juror who was Jewish, given the events at B'nai B'rith and the tapes of telephone conversations that would be played at trial. The court at first agreed, whereupon the prosecutor asked whether all Jews would be stricken because of their religion. The court replied that the woman would be stricken not because she was Jewish "but because . . . ." The prosecutor interrupted: "It looks that way to me, You Honor." The court then asked the woman (outside the presence of the jury array) whether her religion would preclude her being an impartial juror. She indicated that it would not. The court thus declined to strike her for cause (although she became the subject of a peremptory challenge and

did not sit on the jury). We find no misconduct here; the prosecution was only trying to learn the basis for the court's initial decision to strike the juror, as it had a right and responsibility to do.

B. *Examination of Witnesses*

■ Appellants allege numerous instances of prosecutorial misconduct during the examination of witnesses.[43] Almost all of these claims, however, have little if any merit. As to those that do, the trial court commonly corrected or reprimanded the prosecutor and, on those occasions when the jury was present, instructed the jury to disregard the impropriety. The incidents alleged, individually or collectively, do not come close to a basis for reversible error.

More specifically, appellants have mischaracterized a number of the incidents on which they rely. For example, they allege that the prosecution improperly implied that "one of the appellants must be guilty if he refuses to take the witness stand." [44] The incident occurred, however, outside the presence of the jury on a motion to suppress a tape recording which the government sought to introduce in rebuttal. During the course of the argument, which centered on the question whether the voice on the tape was Rahman's, the prosecutor said about Rahman's counsel, "Let his client take the stand." The defense prevailed; the tape was withdrawn; and the jury did not even hear the remark.

In another instance, appellants accuse the prosecutor of responsibility for the "[w]itnesses beginning to reflect same hostile attitude toward defense counsel as exhibited

suspect circumstances—is that apparently the government requested of the court the Williams family be introduced as a family. Every other witness who was introduced was brought out one by one. The Williams's were brought out in a group of three.
 THE COURT: Let me suggest this. Your objection is on the record. Let us start. In view of the seriousness of these charges, the court should should have dealt with them on the record.

42. # 28.

43. For example, improper comments (# s 116, 285); leading or repetitious questions (# s 117, 118, 126, 167, 170, 185, 234, 235, 236, 240, 261, 295); inflammatory presentation of evidence (# s 172, 173, 174); deliberate mischaracterization of testimony (# s 239, 310); interrupting defense counsel's closing argument (# s 305, 306, 307, 308, 309).

44. # 303.

by prosecution" [45]—specifically, "grimacing" (as indicated by the court reporter) and answering slowly the questions on cross-examination. A review of the transcript, however, suggests that the reason for the witness' attitude was the nature of the cross-examination. Counsel for Khaalis was asking questions harshly, arguing with the witness.

In several situations, defense counsel themselves provoked the alleged misconduct of the prosecutor. For example, after the court had sustained the government's objection "to this whole line of questioning" about the 1973 murders of Khaalis' family, counsel for Rahim nonetheless asked a witness, "Were you also told, Mr. Closter, that it was felt the Jews, generally, were behind or involved with the '73 murders of Mr. Khaalis' family?" Appellants, therefore, have no basis whatsoever for complaining about the prosecutor's allegedly inflammatory language in objecting to "that outrageous question." [46]

Similarly, appellants cannot now object to "inflammatory presentation of all the evidence seized from three sites," i. e., all the weapons. [47] The government had been willing to stipulate to the weapons inventory, but several appellants objected because of their strategy, in furtherance of a multiple conspiracy theory, see Part V supra, of demonstrating the disparity in the number and types of weapons seized from the three respective sites.

There were, however, as indicated, several instances where the prosecutor asked improper questions. For example, the prosecutor asked one witness, "During the entire time that you were there did you hear any other persons who were holding you hostage ever say that they were sorry that someone had been killed?" [48] Several counsel objected—one even asked for a mistrial. The court, replied, "Strike that last ques-

tion ladies and gentlemen. Mr. Linsky, that is improper." Similarly, prosecutor Tuohey asked a witness which of two men, Muzikir or Nuh, had indicated with satisfaction "that he shot Marion Barry and got one of the men he was after." The court sustained the objection. The prosecutor asked virtually the same question again. Objection sustained. A third try at rephrasing resulted in another sustained objection—as did a fourth try—whereupon the trial court asked the question in a manner deemed satisfactory. [49] We are not convinced that there was misconduct here; there appeared to be honest confusion over whether the witness had heard a reference to getting Barry or merely "one of the persons."

On another occasion, [50] as counsel for Khaalis was cross-examining a witness to a District Building incident, he asked whether the witness had given a statement to the police. A prosecutor rose and stated:

Your Honor, before Mr. Alexander does that I suggest that he reads the statement and finds out where the northeast corner of the office is. There is nothing impeaching in that statement. I know exactly where he is going, and I suggest
. . . .

Several defense counsel objected and the court sent the jury out of the courtroom for a short recess. The following interchange then took place:

THE COURT: I have been constantly telling the defense that if they have something to object to, they object. But what you did was absolutely wrong. The only reason that I am not giving you any warning this time is that because up until this point you have conducted yourself accordingly. I suggest that if you do that again you are going to get the first warning under the contempt. What is sauce for the goose is sauce for the gander.

---

45. # 63.

46. # 100.

47. # 172.

48. # 161.

49. # s 282–84.

50. # 285.

MR. TUOHEY: I must say for the record that I couldn't agree more, Your Honor.

These particular instances, taken together, do not comprise a basis for reversible error. Moreover, in a seven-week trial, no other instance of alleged prosecutorial misconduct in examining a witness approached the level of impropriety in the above examples, let alone a level of reversible error.

## C. *Closing Argument*

■ Appellants claim prosecutorial misconduct in interrupting the closing argument of counsel for Khaalis.[51] The court, however, sustained each of the prosecutor's objections, including assertions that counsel had made improper comments, that the argument was improper in form, that certain comments were irrelevant, that counsel had made improper statements of the law, and that counsel had mischaracterized the evidence. We concur in the trial court's assessment of defense counsel's argument; there was no prosecutorial misconduct in objecting to it.

## D. *Conclusion*

We have reviewed all instances of alleged misconduct by the prosecutors and applied the balancing test of *Villacres, supra.* Improprieties were few—and not serious. They did not bear directly on "the issue of guilt or innocence." *Id.* at 428. The trial court usually gave "corrective instructions" when desirable. *Id.* The "evidence of appellants' guilt" was overwhelming. *Id.* On balance, we cannot find reversible error. *See Johnson, supra; Jenkins, supra.*

## VIII. JUDICIAL MISCONDUCT

Appellants contend that the trial judge intervened so severely and frequently on behalf of the government that appellants were deprived of their constitutional rights to a fair trial and effective assistance of counsel. As we count them, appellants cite 209 instances of improper judicial intervention, as well as another 65 where appellants were especially critical of the trial court's failure to correct alleged prosecutorial misconduct.[52]

These contentions can be categorized as follows: (1) the trial court refused to listen to the reasons for defense objections of various sorts; (2) the court denied many requests, even "urgent" ones, for bench conferences; (3) the court abused its discretion in issuing orders of contempt against several defense counsel; (4) the court made numerous comments and non-verbal gestures which admonished, belittled, and, in general, demonstrated an impatient, hostile attitude toward defense counsel (and thus appellants); (5) the court itself assumed a prosecutorial role, including improper examination and cross-examination of witnesses; and (6) the court permitted the prosecution to engage, improperly, in leading inflammatory, and repetitious questioning of witnesses.

## A. *Court Procedures in General*

■ Before we evaluate these assertions, it is important to put the trial court's responsibility in perspective. It had the duty to control the proceedings in a manner calculated to assure an orderly and expeditious trial.

> The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. . . . If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings. [*Geders v. United States*, 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334–1335, 47 L.Ed.2d 592 (1976).]

*See Rosenberg v. District of Columbia*, D.C. Mun.App., 66 A.2d 489, 490–91 (1949); *Po-*

---

**51.** # s 305–309.

**52.** In Appendix A to the brief for Khaalis and Adam, appellants have claimed 39 other instances of prosecutorial misconduct, *see* Part VII *supra*, for a total of 313 examples of alleged

misconduct by the government and the court. There is a similar listing of 130 instances of alleged judicial misconduct in Appendix E to the brief for the other appellants.

*sey v. United States*, 416 F.2d 545, 555 (5th Cir. 1969), *cert. denied*, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

We note, first, that with the exception of appellant Adam's unsuccessful motion to sever one count, *see* Part X.D. *infra*, everyone concerned accepted the fact that there was to be a joint trial of all defendants, on all charges. The court had to plan accordingly. More specifically, the court had to deal with the parties' reasonable expectation that the trial would last from four to twelve weeks (it actually lasted seven). The court had to keep in mind, too, that the jury should be sequestered. The court also had to plan for the fact that there were twelve defendants, each with his own counsel. The twelve could be expected, on occasion, to take contrary positions on evidentiary and other issues, adding a dimension of time-consuming, procedural disagreement that ordinarily would not be present if fewer defendants were on trial. On other occasions, however, the defendants could be expected to make the same objections or contentions, creating the potential for considerable repetition and unnecessary delay. In either event, therefore, the court had to anticipate a good deal of interruption in the presentation of the government's case. On the other hand, the court also had to anticipate a highly charged, emotional content to the trial, putting a special burden on the court to assure fairness to each accused. The court accordingly faced the formidable task of fashioning orderly procedures which were fair to the defendants, as well as to the government—procedures which inevitably called for regimentation.

During the jury selection process, *see* Part III *supra*, the trial court had established that defense counsel would ask questions in the order of appellants' indictments, beginning with Khaalis. The court continued this procedure at trial. Next, the court required that if one defense counsel stood to object, the other eleven had to raise their hands—rather than stand—if they wished to join in objecting. The court was attempting to lessen the disruption of twelve counsel standing at once. Counsel soon protested this procedure, however, arguing that they felt "silly." The court therefore modified it, stating that once one counsel had registered an objection, all the others would be deemed to concur, except for those who raised their hands to opt out.

Finally, the court established early in the trial a procedure for holding a bench conference at the end of every day (or sometimes at the luncheon or other recesses), when counsel could state reasons for their objections if not already of record. In this connection, the court invited counsel, as a matter of course, to file any objection in writing if they did not believe it had been adequately addressed on the record.

While accepting the trial court's duty to "exert substantial control over the proceedings," *Geders, supra* 425 U.S. at 87, 96 S.Ct. at 1335, appellants insist that the court abused its discretion in implementing these general procedures and otherwise conducting the trial. We therefore turn to these allegations.

## B. *Alleged Trial Court Refusal to Listen to Reasons for Defense Objections*

Appellants cite 33 instances in which they say the trial court refused to listen to the reasons for defense objections before ruling. Implicit in this argument is the contention that the procedure for registering objections during a court recess or at the end of the day was largely pointless, since the court already had ruled. Also implicit, of course, is the contention that the court ruled incorrectly and prejudicially—a contention which the record belies.

In ten of the instances alleged, the court did listen and gave reasons for overruling defense objections—once sending the jury out of the courtroom in order to do so.[53] In four instances, the court already had given reasons when earlier denying the same ob-

---

**53.** The ten instances to which we refer are # s 2, 7, 8, 50, 77, 165, 193, 200, 211, 217. *See* note 52 *supra*.

jection by another counsel.[54] In four other instances, the court obviously knew the reasons for defense objections because of earlier proceedings, e. g., a defense motion to suppress.[55] Finally, in all three instances where the court expressly refused to hear objections, in the belief that the government would "tie up" the testimony later, the government in fact did so.[56]

Three typical examples from those which remain will serve to demonstrate why appellants' contention here lacks force. Counsel for Khaalis complains that the trial court overruled his objection during the prosecutor's opening statement without hearing his reason.[57] The court, however, did permit counsel to approach the bench after completion of the prosecutor's statement, listened to counsel's motion and argument for a mistrial, and ruled—correctly— that the opening statement had been proper.

On another occasion, Khaalis' attorney asked Ms. Keyes, one of the hostages, whether she had offered the prosecutor any correction of her earlier statement to the police. She indicated that she had. After counsel asked her to elaborate, she stated:

THE WITNESS: Officer Salinas said that I couldn't identify the man with the machete even though—

MR HILL: [Interposing] Objection.

THE COURT: Overruled. Please continue.

THE WITNESS: Even though he was the one who cut me loose.

Counsel for Khaalis then went further into the issue, trying to impeach the witness, whereupon she testified—with defense objections summarily overruled—that the reason she could not see the appellant at the time was because she had been "concentrating on the process of cutting, and the ma-

chete was so big that [she] just couldn't [sic?] see his hand and the knife." As indicated, counsel himself had asked the questions leading to the answers to which he objected. The court, in fact, permitted further cross-examination after the statements had been made. There was no judicial abuse.

Still another instance concerns Officer Daly's testimony on direct examination that appellant Adam had said something to him at the time of arrest. On cross-examination, defense counsel impeached the officer by eliciting a statement that Adam had said nothing when arrested. On redirect, Officer Daly reconfirmed that his notes reflected that Adam had said nothing. The court quickly overruled a defense objection during this colloquy but did permit counsel to cross-examine for a second time about the matter. This was a minor bit of testimony which reflects no prejudice from the court's overruling a defense objection without hearing the reason.[58]

 As the foregoing examples make clear, appellants' arguments about the court's refusal to listen are without merit.

## C. Allegedly Improper Denial of Defense Requests for Bench Conferences

Appellants allege that on 14 occasions during pretrial and trial proceedings, the court denied bench conferences without justification. This contention is also overstated. Three instances occurred during voir dire of individual jurors,[59] where the trial court had established clear procedures: counsel were to note the names of jurors and would have an opportunity, at the end of every voir dire session, to move to strike particular persons. As to the trial, in two

54. # s 9, 15, 71, 114.

55. # s 85, 104, 115, 125.

56. # s 88, 178, 197.

57. # 44.

58. This example, # 80, is representative of the trial court's general willingness to permit defense counsel a full opportunity to cross-examine a government witness, even though at times the court was quick to overrule defense objections.

59. # s 32, 33, 34.

instances no bench conference was requested.[60] In another, the court denied the request but called a recess immediately in order to hear counsel outside the presence of the jury altogether.[61] In another, the objection and request for a conference were irrelevant to the immediate issue.[62]

The only significant allegation concerns the cross-examination of an eyewitness, Marion Barry.[63] The court sustained a government objection to a question by counsel for Muzikir and told counsel that he was arguing with the witness. Counsel replied, "I wouldn't argue with this witness, Your Honor." The court then said, "It doesn't call for any commentary," and counsel answered that he did not mean to be disrespectful. The court sent the jury and the witness out, called Muzikir's counsel to the bench, and held him in contempt for continually arguing with the court. The court then assured him that the contempt order would be sealed and deferred until the end of trial (as the court had treated an earlier contempt order directed at counsel for Khaalis). After a brief recess, the court recalled Barry to the stand; Muzikir's counsel asked permission to approach the bench again. The court replied that he would afford counsel time at the end of the day; counsel protested; and the court sent the jury and the witness out for a second time. The court instructed counsel, "Not one word out of you" and held him in contempt again. The court added that this second order would be sealed until the end of trial, and that counsel would have time at the end of the day to argue his point. The court concluded by saying that counsel could resume his seat or ask questions, but if he otherwise said one word the court would hold him in contempt. The jury returned and counsel for Muzikir stated: "In view of what has happened, Your Honor, I have no further questions." The court or-

dered the jury and the witness out for a third time, citing counsel once again for contempt for prefacing "no further questions" with an "absolutely contemptuous remark."

Once the jury and the witness had returned, counsel for Rahim asked to approach the bench; the court refused and told him to put any motion in writing. Counsel for Al Qawee then joined in the request: "I say that my professional responsibility requires me to ask to approach at this time, not at a later time." The court refused, asking him to save it for the end of the day, whereupon counsel for still another of the appellants, Nuh, proceeded to cross-examine.

■ As an abstract proposition, the court arguably should have permitted counsel for Rahim and Al Qawee to approach the bench when they stressed that they had serious questions of professional responsibility. On the other hand, the court had indicated earlier that it would be available at the end of the day for bench conferences, as well as for motions and objections in writing. The record reflects no defense motion or objection following this incident. The court had authority to keep disruption in front of the jury at a minimum by admonishing counsel and taking other means reasonably necessary to maintain the dignity of the court and expedite the proceedings. *Rosenberg, supra* at 490–91. In the context elaborated above, we find no abuse of discretion.

D. *Alleged Judicial Abuse in Warnings and Orders of Contempt*

■ At several points during the trial, the court gave warnings and eventually held counsel for Khaalis, Rahim, and Muzikir in contempt of court.[64] All warnings were given out of the presence of the jury,[65]

60. # s 179, 272.

61. # 18.

62. # 1.

63. # 232.

64. # s 189, 215, 229, 230, 231, 288.

65. # s 69, 152, 210, 253.

and all contempt orders were deferred until the end of trial.[66]

The first warning to counsel for Khaalis occurred at a motions hearing, when counsel began to argue with the court and refused to take his seat.[67] The press apparently overheard the warning because the court inadvertently had failed to turn off the microphone (for which the court later apologized). There was no prejudice to appellants here, for the jury was not in the courtroom.[68]

**66.** The court also warned the prosecutors when they were risking contempt of court. [Tr. 5533–34, 6286.]

**67.** The transcript of the incident is as follows:
MR. ALEXANDER: I have a motion.
THE COURT: All right, sir.
MR. ALEXANDER: This is a motion to dismiss the indictment, for release of Mr. Khaalis on person recognizance.
THE COURT: Has this been filed and ruled on before, sir?
MR. ALEXANDER: No, sir. I have filed oral motions. If Your Honor will indulge me?
THE COURT: Are you just filing that right now?
MR. ALEXANDER: If Your Honor will indulge me?
THE COURT: Are you going to sign that right now? Answer my question.
MR. ALEXANDER: Yes, sir.
THE COURT: Well, file it, sign it, submit it to the court. I will not permit you to argue at this time. I will take it under consideration. We will proceed.
MR. ALEXANDER: If Your Honor will indulge—
THE COURT: Submit it to the clerk of the court.
MR. ALEXANDER: I am asking for your indulgence for a change.
THE COURT: No sir. I am asking you to submit it to the clerk of this court. Now take your seat. I will take your motion under advisement.
MR. ALEXANDER: Will you allow me to be an advocate under the sixth amendment to the Constitution?
THE COURT: I will sir. But you will not run this court. Now sign it and—
MR. ALEXANDER: [Interposing] Will you allow me to represent my client?
THE COURT: Mr. Alexander, for the third time, I am telling you, sir, to take your seat.
MR. ALEXANDER: This motion is filed—
THE COURT: [Interposing] Gentlemen, approach the bench.
[Thereupon, counsel for all parties approached the bench and conferred with the court, as follows:]

The second incident occurred during the second day of trial when counsel for Khaalis asked a question of a witness ruled improper by the court. When the court suggested that counsel not turn his back on the court, counsel began to argue. The court immediately sent the jury out and gave a general warning to all counsel about the importance of maintaining calm and dignity throughout the proceedings, and what specific actions would constitute contempt.[69] There was no judicial misconduct.

THE COURT: This is your warning, sir, that you are in contempt of court. You are entitled to notice, sir. If you continue and if it ever happens again after I repeatedly order you to take your seat, you will be in contempt, and I will call you forward and I will serve you with the order each day on the following day.
You are given your notice, sir. You are in contempt of this court. Now take your seats, all of you.
MR. ALEXANDER: If Your Honor please—
THE COURT: [Interposing] No comment, sir. Take your seats, gentlemen, at this time.

**68.** The jury was soon thereafter empaneled, sworn, and sequestered; there is no indication that any press report of the incident reached any of the jurors.

**69.** The transcript of the incident is as follows:
MR. ALEXANDER: Does he work at B'nai B'rith?
WITNESS: He was working there on the day of these events, yes.
Q. He is way down on the totem pole in salary, isn't he?
MR. TUOHEY: Objection, Your Honor.
BY MR. ALEXANDER:
Q. Is that right sir?
THE COURT: Mr. Alexander, that is an absolutely improper question, sir. I admonish you not to ask questions like that, sir.
MR. ALEXANDER: Well, I am going to find out who it is.
THE COURT: No, you are not. Not in my courtroom. You will ask questions pursuant to law and I will rule pursuant to law. I suggest that you not turn your back on this court.
MR. ALEXANDER: Sir, my back is not turned on this court.
THE COURT: It is. You just turned your—
MR. ALEXANDER: [Interposing] I am one of the most—
THE COURT: [Interposing] I would suggest, sir, that you just ask questions.

E. *Comments that Allegedly Belittled, Admonished, and Otherwise Reflected the Trial Court's Impatient and Hostile Attitude Toward Defense Counsel*

■ Appellants cite approximately 100 instances of comments by the court which allegedly reflected a hostile attitude toward the defense. We have reviewed each one and find no reversible error, either singly or collectively.

In the first place, contrary to appellants' allegations, in 42 of these instances the judge's comments were made at bench conferences, away from the jury, or at motions hearings when the jury was not in the courtroom.[70] In seven others, the court was

MR. ALEXANDER: I am standing the same as—

THE COURT: [Interposing] No, sir.

MR. ALEXANDER: [Interposing]—The prosecutor was.

THE COURT: Mr. Marshal, take the jury out, please. Gentlemen, approach the bench. Cut the machine off, please.

[Thereupon, the jurors withdrew from the courtroom at approximately 2:42 p. m.; counsel for all parties approached the bench and conferred with the court, as follows:]

THE COURT: I am going to read a statement to you. The microphones are turned off. I suggest you listen to it. I direct myself to you and then I am ordering you all back to your seats.

At this time I feel it is necessary that a general warning be given counsel concerning contempt of court. Thus far during this trial—and that begins from the very first day—conduct constituting contempt has occurred.

I have, in my judicial discretion, suffered the occurrences of this conduct without formally advising any counsel with contempt of court, because the proceedings for the most part have been conducted out of the presence of the jury.

But now we have a jury in the box. This is their second day. Insofar as I am concerned, you are going to conduct yourselves accordingly in the presence of the jury.

In order to assure that your clients receive a fair trial before an unbiased jury, as well as to insure an atmosphere of judicial calm, sir—judicial calm—and purposeful dignity before the public, and to prevent a demoralization of the authority of this court before the jury and the public, counsel are warned that the following conduct which thus far has been observed by this court, the court will consider contempt of this court and will be disposed of accordingly.

Number one, the refusal of counsel to obey clear and unambiguous directions of this court to be seated; that's number one.

Number two, defying the authority of the court by refusing to leave the bench and take their seats after ordered to do so;

Three, the refusal of counsel to terminate further argument after I have ruled;

Four, the act of counsel turning his back on the court or sideways, sir, while the court is speaking, or while speaking to the court.

Gentlemen, I am well aware of your responsibilities to your clients. I do not expect you to be timid spokesmen. To the contrary. Yet, you must be aware the obligations of zealous advocacy are no excuse for undignified or discourteous conduct, nor do they immunize you from the lawful orders of this court.

MR. ALEXANDER: [Interposing] Your Honor—

THE COURT: [Interposing] For further guidance to this matter I direct your attention to Criminal Code 42—DC Code 11–944; and in the matter of *Leroy Nesbitt*, sir.

Now, this is a general warning for you, gentlemen.

[Addressing Mr. Alexander] But you, sir, are getting a specific warning. This is your notice:

If you ever argue with me after I have ruled—because you well know that once I have ruled your objection is on the record—if you argue with the court after I have ruled and you fail to respond and continue to ask questions, sir, you will be held in contempt of this court, and I will file it—the specifics, pursuant to the *Meyers* case, as I have read it.

You will be served with an order of the court.

MR. ALEXANDER: Your Honor—

THE COURT: [Interposing] Thank you very much. Take your seats.

MR. ALEXANDER: May I ask a question?

THE COURT: No, sir.

MR. ALEXANDER: May I have a copy of that?

THE COURT: If you want a copy of that it is in the record. If you want it, you can get it.

**70.** # s 5, 20, 22, 23, 24, 39, 40, 43, 46, 56, 57, 61, 66, 72, 73, 74, 75, 76, 92, 93, 110, 119, 120, 156, 166, 169, 177, 183, 184, 189, 190, 207, 208, 209, 216, 241, 242, 249, 262, 286, 287, 290.

The most serious of the allegations, when the jury was out of the courtroom, concerns the period during *voir dire*. Appellants allege a "distasteful racial joke." Counsel asked the court to inquire whether prospective jurors were discussing the case among themselves. He declined because they had been sworn not to discuss it. More specifically:

merely ruling, without evident hostility, on the question of relevance or other evidentiary matters, or on the proper procedure for counsel to follow.[71] On three other occasions, the court was properly responding to defense counsel's own remarks and behavior.[72] Six other instances merely reflect that defense counsel were being repetitious, had failed to take notes, or were wasting time.[73] Most of the other examples are either frivolous[74] or not otherwise significant enough to warrant discussion.

The trial court, however, did make several comments which, under the circumstances, were uncalled for, although not sufficiently prejudicial to warrant reversal. For example:

> [Interrupting the prosecutor:] Mr. Hill [counsel for Muzikir], *I suggest that you remove the amazement from your face, sir.* Mr. Linsky, propound your question one more time. [Emphasis added.][75]

> \* \* \* \* \* \*

> [After the court sustained a government objection:]
>
> SANSING [Counsel for Nuh]: May I ask on what grounds?
>
> THE COURT: I have ruled, sir. It is obvious to the court. *I am not running a school.* Proceed. [Emphasis added.][76]

> \* \* \* \* \* \*

MR. KUBINSKI: Your Honor, I would ask some of the people at random if they are talking about the case outside.

MR. ALEXANDER: I have a different suggestion with respect to that. It is inconceivable to me how so many people haven't had opinions and ideas.

THE COURT: That is not my point. The point is that I accept the answers. Now they have changed them after being sworn. You are challenging what they are saying?

MR. ALEXANDER: I am only saying that soul-searching that you asked for could well produce this.

THE COURT: No. The soul city out there might well produce this.

Appellants also allege that the trial court wrongfully accused appellants of being disruptive. # 39. The instance cited took place at a bench conference, during a recess of the jury *voir dire.* The court noted that he had observed appellants passing notes to each other, and that he wanted to ascertain whether they were likely to disrupt this highly sensitive,

[During cross-examination of Officer Austin concerning identification of Muzikir as the one who may have fired the shotgun killing Maurice Williams:]

> THE WITNESS: Sir, I have an explanation.
>
> THE COURT: "Yes" or "no." But if you have an explanation I will permit it. Is it "yes" or "no"?
>
> THE WITNESS: Yes, sir, I saw the man with the shotgun[;] heard the noise.
>
> THE COURT: What is the explanation?
>
> THE WITNESS: Sir, it is obvious—
>
> THE COURT: [Interposing] No.
>
> MR. HILL: Nothing is obvious here.
>
> THE COURT: *I would disagree with you, Mr. Hill. So just don't make such broad generalities.* [Emphasis added.]
>
> [Laughter]
>
> THE WITNESS: The only thing, sir, I saw the man with the shotgun in his hand.[77]

> \* \* \* \* \* \*

[During cross-examination of Dr. Rauf by Mr. Kubinski, counsel for Shaheed]:

> Q: Dr. Rauf, you have a statement in Arabic a few minutes ago. Would you repeat that statement again, please?
>
> THE COURT: Excuse me. *Are you going to memorize it? Or do you want it*

emotionally charged phase of the proceedings. Thus, appellants are not correct in alleging that the court "banished" them from the presence of the jury array. Appellants missed none of the *voir dire;* after the recess, the trial court continued it in their presence. There was no judicial misconduct.

71. # s 131, 169, 185, 205, 206, 225, 272.

72. # s 152, 176, 203.

73. # s 154, 181, 198, 203, 273, 296.

74. *E. g.,* # s 132, 133, 143, 144, 146, 150, 182, 186, 214.

75. # 141. The court made a similar comment to the prosecution.

76. # 245.

77. # 237.

*spelled, or what, Mr. Kubinski? Or do you know?* [Emphasis added.]

[Laughter]

MR. KUBINSKI: I don't know the phrase, Your Honor.

THE COURT: He gave it once, Did you write it?

MR. KUBINSKI: It was in Arabic.

THE COURT: I don't think anyone wrote it down. Can you spell it for us? I suggest you take pen in hand.

THE WITNESS: The statement, which means, "In the name of God, the merciful and the compassionate." are you meaning?

THE COURT: Yes.

BY MR. KUBINSKI: Is that the statement that was made?

A. Well, that is the formula the brothers repeated when they started talking on the telephone as if it was a greeting manner.

Q. Would you say it in Arabic slowly, please, so I can write it?

A. . . . [Foreign words]

[Laughter]

THE COURT: *I hope you got that, Mr. Kubinski.* [Emphasis added.]

[Laughter] [78]

\* \* \* \* \* \*

[During cross-examination of Miss Von Goetz, a hostage whom appellants had released:]

[MR. O'BRIEN]: Do you have a heart condition, Miss Van Goetz?

A. No.

MR. TUOHEY: What is the relevancy of this, if she has a heart condition?

THE COURT: She has answered the question.

MR. O'BRIEN: Your Honor . . .

MR. HILL: [Interposing] There was so much confusion in here I didn't hear

the question. Could I have the question repeated and the answer?

THE COURT: *A likely story, Mr. Hill.* [Emphasis added.]

[Jurors laughing] [79]

\* \* \* \* \* \*

The foregoing remarks—in the context of "an unusually lengthy, sometimes heated, hard fought multiple defendant trial"—were unfortunate. *Clifton v. United States,* D.C.App., 363 A.2d 299, 301 (1976). They do not approach the "escalating antagonism," "heated exchanges," exhausted patience, and other abuses of discretion cited in *Braxton v. United States,* D.C.App., 395 A.2d 759 (1978). While we do recognize that judicial admonishment of counsel, in the presence of jurors, may well affect a jury verdict in some circumstances, we conclude that appellants have suffered no prejudice from the court's remarks here. *See Oesby v. United States,* D.C.App., 398 A.2d 1, 10 (1979). There is no reversible error. [80]

■ Finally, appellants claim four instances of the trial court's non-verbal behavior—facial expressions or pointing a finger—indicating prejudicial hostility to the defense. [81] On the first occasion, defense counsel moved for a mistrial on this basis. [82] We are aware that it is difficult to recapture the atmosphere of a trial from a typewritten transcript, especially non-verbal behaviors. We are also mindful, however, that appellants have cited very few instances—in one of which the court properly admonished both counsel for Khaalis and the prosecutor for improprieties which occurred over certain *Jencks* material. [Tr. 2183–94.] We should not magnify on appeal incidents of little importance in the context of a seven-week trial. *Compare Williams v. United States,* D.C.App., 228 A.2d 846, 847 (1967) (trial court over-managed and dis-

---

78. # 226.

79. # 199.

80. Appellants cite examples in which the court allegedly was too curt with defense counsel, #s 5, 22, 76, 86, or used too firm a hand in insisting that counsel takes their seats, #s 20,

32, or admonished counsel too harshly for repetitive questioning, #s 23, 70. These contentions have no merit.

81. #s 36, 72, 107, 157.

82. # 36.

credited counsel in the eyes of the jury). We cannot find sufficient merit here to warrant reversal.

### F. *Allegedly Improper Examination of Witnesses and Other Prosecutorial Conduct by the Court*

Appellants complain that the court assumed a prosecutorial role in questioning several witnesses, and that the jury, accordingly, must have perceived a hostile attitude toward appellants.

█ 1. The trial court, of course, does have a role in asking questions.

It is beyond question that a court may interrogate a witness in the aid of truth and furtherance of justice [citations omitted], and it is not only the right but the duty of the trial judge to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case. [Citations omitted.] To what extent the court will intervene for this purpose is a matter of discretion. [Citations omitted]. [*Womack v. United States*, D.C.App., 350 A.2d 381, 382–83 (1976).] [83]

█ There was only one significant instance of the court's asking questions.[84] During the testimony of Mr. Simon, one of the hostages, after counsel for Hamid had completed cross-examination, the court inquired about Hamid's role in the incident where Adam and Latif had broken through a door at B'nai B'rith, Adam had stabbed Mr. Kirkland, and someone had said, "Do that again and I'll kill you!" In the process, the court incorrectly referred to Latif, not Adam, as the one "who stabbed Mr. Kirkland," although a few moments later the witness testified that Latif was the one "who said that [*i. e.*, the 'kill you' statement] to the person who did the stabbing," thereby implicitly correcting the court's misstatement. (Previous testimony had also established that Adam had stabbed Kirkland.) After completing its questions, the court permitted counsel for Hamid to resume cross-examination, whereupon counsel was able to establish, for a second time, that Hamid had not made the "kill you" statement. Although the court, in this instance, intervened in the sensitive area of identifying the participants in specific assaults, it is clear that the court was attempting to perform a clarifying role. There was no abuse of discretion—and no prejudice. *See Womack, supra.*

Only one other instance should be mentioned. After counsel for Khaalis and Muzikir had completed cross-examination of Mr. Rudman, a B'nai B'rith hostage, the court followed up counsel's last question (whether Rudman had had lunch "yesterday" with another witness, Henry Siegel) by asking Rudman: "Did you discuss your testimony with anyone before you came in here today?" The witness replied, "No." The court then pursued defense counsel's questions about Rudman's statement to the police and probed further into the question whether Rudman had testified on the basis of his own recollections or of newspaper or other media accounts.[85] Counsel for Khaalis objected. The court's questions were entirely proper in seeking to insure that publicity—before and during trial—and collaboration of government witnesses were not

---

83. *Womack, supra,* involved a six-day trial with eleven witnesses; appellants there cited two instances where the court asked questions. The present case—covering over a hundred witnesses in seven weeks—included relatively fewer questions by the court.

84. # 140.

85. # 147.
 THE COURT: When this statement was made you read it. Is that right?
 THE WITNESS: That is correct.

THE COURT: Have you testified before this jury based upon what is written here, or what you recall?
 THE WITNESS: Based upon my recollection of the events.
 THE COURT: Did anyone ever tell you what to say?
 THE WITNESS: No.
 THE COURT: Your identifications in this case are from your own recollections, or based upon what you may have seen by way of newspaper or media prior to this trial?
 THE WITNESS: They are based on my own recollections.

influencing the testimony. Moreover, the court made its role clear to the jury at this point:

> Ladies and gentlemen, so that there is no misunderstanding here, the court can ask questions for your benefit. As you know, you sit there and you cannot ask questions. When the court feels that it is relevant that that information be given to you, the court is empowered to ask these questions to clarify issues, because I take no position. I don't know what the answers are, but I felt that these issues should be presented to you.

There was no error.

On several other occasions the court asked a few, brief follow-up questions to clarify testimony usually after all counsel—government and defense—had indicated that they had no further questions.[86] Far from undertaking a prosecutorial role, the court asked questions "in the aid of truth." *Womack, supra* at 382. *Compare Haughton v. Byers,* D.C.App., 398 A.2d 18, 21 (1979) (new trial ordered in personal injury action because of trial court's extensive examination of witnesses and highly prejudicial comments before the jury).

▬ 2. Appellants allege a potpourri of approximately 20 other instances of the trial court's assuming a prosecutorial role, usually in the form of objecting itself to defense counsel's questions. In at least seven of these, the jury was either out of the courtroom or the comments were at the bench out of the jury's hearing.[87] On one occasion the court objected to a question by Khaalis' counsel because the court had already ruled on the issue.[88] On another, the court objected because the same counsel was arguing with a witness.[89] On still another, the court was clearly not assuming a prosecutorial role; it was merely issuing a

legal ruling.[90] Occasionally, however, in sustaining a government objection, the court added an unnecessary prefatory remark; *e. g.,* "I suggest that you should have objected a long time ago because it is improper and irrelevant."[91] And again: "Excuse me. Isn't this beyond the scope of your direct? Are you [the prosecutor] permitting this?"[92] Although such remarks were "unfortunate," *Clifton, supra* at 301, *see* Part VIII. E. *supra,* they were few in number and not, overall, prejudicial. *Compare Williams v. United States, supra* at 847.

3. In summary, the court, through its questions and *sua sponte* objections, facilitated the fact-finding process; it did not side with the prosecution. *Compare Womack, supra, with Petway v. United States,* D.C.App., 391 A.2d 798 (1978).

### G. Alleged Indulgence of the Prosecution to Ask Leading, Repetitious, and Other Improper Questions

Appellants cite a number of instances where the court allegedly was at fault in permitting the prosecution to ask improper questions. There is no merit to this assertion.

▬ It is true that the court did permit a number of leading questions on direct examination, but most of these occurred during the first few minutes of a witness's testimony and served to expedite the trial, without prejudice to appellants, by generally focusing the witness's attention on the time and place of certain events.[93]

Contrary to appellants' assertions, it is not true that the trial court permitted inflammatory testimony by government witnesses. For example, when appellants objected to a witness's use of the term "hos-

---

86. #s 41, 84, 94, 137.

87. #s 4, 62, 94, 110, 164, 183, 184.

88. # 120.

89. # 183.

90. # 95.

91. # 130.

92. # 248. In several other instances, *e. g.,* #s 54, 58, 59, 60, 202, 264, 265, the court signalled the prosecutor to object to defense counsel's questioning.

93. *See, e. g.,* #s 52, 98, 101, 117, 121, 135, 138, 148, 158, 159, 167, 170, 219, 223, 227.

tage," the court initially prohibited its use. After several days of testimony, however, when several witnesses had established that in fact they had been held hostage, the court relaxed the prohibition, for it no longer could be deemed prejudicial.[94] It is fair to say, in summary, that the court generally was careful to limit all the witnesses to their direct observations, cutting them off if they started to use inflammatory words or give their "impressions" about how appellants or other hostages felt.

It is also fair to characterize a number of the allegations here as frivolous. For example, on some occasions, rather than permitting improper questioning by the prosecution, the court was merely ruling on a legal point,[95] allowing a proper, not a repetitious, question,[96] or permitting leading or otherwise proper questions on cross-examination of Khaalis by the prosecution.[97] In two other instances, appellants have misread the record, as the court partially sustained the defense objection.[98]

### H. *"Cumulative Impact" of the Alleged Misconduct*

We recognize that appellants have proffered the many instances of alleged judicial misconduct for their "cumulative impact." *Jackson v. United States,* 117 U.S.App.D.C. 325, 326, 329 F.2d 893, 894 (1964); *see Petway v. United States, supra* ; *United States v. Dellinger,* 472 F.2d 340, 391 (7th Cir. 1972); *Egan v. United States,* 52 App.D.C. 384, 387, 287 F. 958, 961 (1923). Thus, we

**94.** # 127.

**95.** *E. g.,* #s 89, 187, 254, 255.

**96.** *E. g.,* #s 102, 113, 118, 126, 128, 136, 150, 218.

**97.** *E. g.,* #s 234, 298.

**98.** #s 111, 112.

**99.** For example, counsel for Khaalis, who always had the first opportunity to cross-examine for the defense (and thus took the most active defense role), is not immune from criticism for various actions both in and out of the presence of the jury. On occasion, he made improper opening remarks to the jury [Tr. 6101–04], argued with witnesses [Tr. 2995, 3581, 4810–11], interrupted the court [Tr. 1780,

have considered very carefully whether all the instances taken together constitute reversible error, even though we have concluded that the examples in each particular category, taken by themselves, do not. In making this analysis, we also have had to examine defense counsel's own conduct, as well as the trial court's overall performance—including its rulings for, as well as against, the defense. We note that the court's allegedly objectionable behavior frequently was prompted by the improper conduct of defense counsel.[99] Furthermore, the trial court did not orient its rulings toward the government, "tilting the balance against the accused and casting the judge, in the eyes of some jurors, on the side of the prosecution." *Jackson, supra,* 117 U.S. App.D.C. at 326, 329 F.2d at 894. The court ruled for the defense on numerous occasions. For example, the court commonly clarified testimony or *sua sponte* raised objections in favor of the defense [Tr. 1780, 2411, 2381, 5496], overruled government objections and sustained defense objections (including several during the prosecutor's rebuttal closing argument) [Tr. 1535, 2046, 2091, 2260, 2269–71, 2310, 2334, 3558–59, 4069, 4322, 4326, 4649, 5304, 6241, 6274, 5520, 5682], told the prosecutor to wait until a recess to document its objections [Tr. 2791], admonished the prosecutors for improprieties [Tr. 2192, 2384, 2829, 2980, 4624–25, 4644, 5493, 5533–34, 5684, 5561, 5686, 6240, 6764], excused the jury to warn the prosecutors that they were risking con-

1788–89, 2191–92, 4737, 6764], commented on the testimony and the court's rulings [Tr. 1428, 2282, 3511, 4810, 5117, 5200, 5237], improperly used a document [Tr. 5479], asked improper questions [Tr. 1808, 2431, 5436, 5478, 5680], "baited" the court (*e. g.,* "Your Honor direct the witness to answer the question, it's a very simple question") [Tr. 4810–11], and otherwise argued with the court on numerous occasions [Tr. 1453, 1808, 2282, 2339–40, 2818–19, 2828, 3099, 3433, 3483, 3500–01, 3577, 3581–82, 4811, 5200, 5400–01, 6763–64]. Other counsel, too, did not wholly refrain from commenting on the evidence [Tr. 4069, 4743], arguing with a witness [Tr. 5564], arguing with the court [Tr. 3098], and moving for a mistrial in front of the jury [Tr. 2980].

tempt [Tr. 5533, 6286], and ruled in favor of the defense on a number of critical issues, such as suppressions of in-court identifications [Tr. 5502, 4679] and a taped conversation [Tr. 6463].

In its final instructions to the jury, the court put its role in perspective:

> The actions of the court—and we are talking about my actions at this time— actions of the court during the trial in ruling on motions or objections by counsel or in comments to counsel, or in questions to witnesses, or in setting forth the law in these instructions are not to be taken by you as any indication of my opinion as to how you should determine the issues of fact.
>
> I assure you that I take no position whatsoever. So please don't read anything into my rulings during the course of this trial.
>
> If you believe that I have expressed or intimated any opinion in any way as to the facts, disregard it because the verdict is your duty, your responsibility.

Compare *Quercia v. United States*, 289 U.S. 466, 472, 53 S.Ct. 698, 700, 77 L.Ed. 1321 (1932) (trial court's "characterization of the manner and testimony of the accused was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence").

█ In summary, we find no basis for reversing appellants' convictions after examining the trial court's conduct. Especially in view of the overwhelming evidence against appellants, *see Rosenberg, supra* at 491, the "cumulative impact" of the court's conduct was not prejudicial.

## IX. POST–TRIAL EVIDENCE OF A JUROR'S MENTAL INFIRMITY

Appellants seek a new trial based on post-trial evidence that a juror may have been suffering from a mental infirmity during the jury's deliberations.[100]

A. The jury returned its verdicts on July 23, 1977; the court imposed sentences on September 6, 1977. Two months later on November 7, 1977, appellant Khaalis filed a Motion for New Trial and a Motion for Writ of Subpoena Duces Tecum for In Camera Examination of Records of St. Elizabeths Hospital concerning one of the jurors. Two weeks later, on November 23, 1977, Khaalis filed a Supplemental Motion for New Trial, accompanied by Motions for Writ of Subpoena Duces Tecum for In Camera Examination of Records of the same juror at the United States Postal Service, D.C. General Hospital, and Howard University Hospital. In these motions he requested a hearing based on unverified allegations that an undisclosed informant employed by the United States Postal Service had revealed that the juror (who was a postal employee) had "exhibited bizarre and irrational behavior during jury deliberations," and that after the trial the juror had "suffered attacks from a mental disorder," had engaged in "bizarre and irrational conduct," had been examined by a physician at the Postal Service "with respect to fitness for service and disability," and had been "institutionalized at D.C. General Hospital[ ] and treated, in addition, at Howard University Hospital for conditions relating to mental disability." In his supporting memoranda, Khaalis asserted, more specifically, that during jury deliberations "the suspect juror was barricaded in a restroom for an undetermined amount of time," and that as examples of "bizarre and irrational behavior" the juror "allegedly committ[ed] an act of arson to her apartment on October 11, 1977, wander[ed] confused and disoriented about certain sections of the city, and finally [had] to be committed to St. Elizabeth's Hospital. . . ."[101]

---

100. D.C.Code 1973, § 11–1901 incorporates 28 U.S.C. § 1865(b)(4) (1976), which permits one to be disqualified from jury service if he or she "is incapable, by reason of mental or physical infirmity, to render satisfactory jury service."

101. All other appellants also filed motions for a new trial based on the alleged mental infirmity of the same juror. We discuss only Khaalis' motions because they were the most detailed.

On December 16, 1977, in a comprehensive written opinion and order, the trial court denied the motions, without a hearing.[102]

B. There is a wise, traditional rule that a juror cannot impeach his or her own verdict. *Sellars v. United States,* D.C.App., 401 A.2d 974, 981–82 (1979); *see McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). ABA Project on Minimum Standards for Criminal Justice, Trial by Jury § 5.7 (Approved Draft, 1968); Fed. R.Evid. 606(b). Not long ago, the United States Court of Appeals for the Third Circuit summarized the reasons for this rule:

The rule was formulated to foster several public policies: (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body. [*Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) (citations omitted).]

*Accord, King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Wilson,* 175 U.S.App.D.C. 173, 176–77, 534 F.2d 375, 378–79 (1976); *United States v. Dioguardi,* 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

The general rule, however, acknowledges the defendant's right to a jury of impartial, competent jurors, and accordingly is subject to an exception permitting a juror to testify about influences, external to the jury, which affected the verdict.

"[A] juryman may testify to any facts bearing upon the question of the existence of any *extraneous influence,* although not as to how far that influence operated on his mind." [*Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50,

53, 36 L.Ed. 917 (1892) (quoting *Woodward v. Leavitt,* 107 Mass. 453) (emphasis added).]

More specifically, according to the federal circuit court in *Government of Virgin Islands v. Gereau, supra* at 149–150:

"Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of the defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

*See Edwards v. District of Columbia,* D.C. Mun.App., 68 A.2d 286 (1949); *United States v. Pellegrini,* 441 F.Supp. 1367, 1370 (E.D.Pa.1977), *aff'd,* 586 F.2d 836, *cert. denied,* 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Wilson, supra.*

Although this distinction between "extraneous" and "intra-jury" influences is generally appropriate for determining whether to permit a juror's testimony to impeach the verdict, that distinction is not necessarily meaningful when the threshold question of a juror's very competence is at issue. Thus, there is a further, tightly-circumscribed exception permitting inquiry into a juror's mental competence. In *United States v. Dioguardi, supra* at 79, the United States Court of Appeals for the Second Circuit has expanded the exceptions into the following formulation:

The rule against any inquiry whatever recognizes exceptions only where [1] *there is clear and incontrovertible evidence of incompetence shortly before or after jury service,* [2] clear evidence of some criminal act [e. g., jury tampering] or [3] evidence of some "objective fact"

---

102. Also on December 16, 1977, Khaalis filed a Motion for Mental Observation and Request for Hearing on the Motion for New Trial. This was mooted by the trial court's order of the same date.

of internal impropriety. [Emphasis added.] [103]

As to the first exception, the *Dioguardi* court elaborated:

It is well settled that only clear evidence of a jury's incompetence to understand the issues and to deliberate at the time of his service requires setting aside a verdict. And only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence in fact did exist. [*Id.* at 78.]

*Accord, United States v. Hall,* 536 F.2d 313, 323 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Dozier,* 522 F.2d 224, 228 (2d Cir.), *cert. denied,* 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975); *United States v. Cortes,* 440 F.Supp. 689 (D.P.R.1977). *Dioguardi* pointed out, moreover, that the courts generally have found such "clear" and "strong" evidence of incompetence limited to an "adjudication" of mental illness or incompetency "closely" in advance of or after the trial. *Id.* at 80. In fact, evidence of such an adjudication is usually necessary even to justify the court's conducting a hearing into the alleged incompetence. *Id.; accord, United States v. Allen,* 588 F.2d 1100, 1106–07 & n. 12 (5th Cir. 1979); *see United States v. Handy,* 454 F.2d 885, 890–92 (9th Cir. 1971), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972).

C. In the present case, appellants did not meet the criteria justifying a hearing on the juror's mental competence. Their proffers were insufficient. As already indicated, the motions were conclusional. Nor did appellants support their allegations with affidavits disclosing the source of their information or verifying the details.

As to the only jury-room incident that was alleged, we perceive no basis for disturbing the trial court's finding that "[n]o evidence has been proffered to the court to support the allegation that the juror at issue was 'barricaded' in the bathroom." [104] Similarly, with respect to the juror's post-trial behavior, we agree with the trial court that appellants proffered no "clear and uncontrovertible evidence of incompetence shortly before or after jury service." *Dioguardi, supra* at 79. If the information appellants received from the postal employee about the juror's behavior raised a serious question of mental infirmity, appellants can be expected to have alleged and filed affidavits verifying what information they had in detail—especially references to facts tending to show mental infirmity close in time to the trial itself. Appellants cannot expect the court to launch a fishing expedition into a juror's mental competence and, ultimately, into the jury deliberations themselves, without proffering and verifying

---

**103.** Examples of "objective facts" of internal impropriety, which are akin to—and include—extraneous influences, would be a "blood relation between juror and defendant or extraneous material brought to the jury's attention during deliberations." *Id.* at 79 n. 12.

**104.** The court noted that on the third day of jury deliberations the court clerk, who had "entered the jury room in order to advise the jury concerning a request for coffee," advised the court that he had observed a juror "exit[ ] from the bathroom, which was within the deliberation room," and that "it appeared as if the juror had been crying." The court then "informed the Court Clerk that, if it became apparent that one of the jurors was 'hiding' in the bathroom, the facility would be locked." The court added:

Later that day, at the close of business, the Court, after having knocked on the deliberation room door and instructing the jurors to

cease deliberating, stood in the doorway of the room in order to inform the jury that the Court was adjourning for the evening. The Court observed the juror at issue and the eleven other jurors sitting around the jury table and nothing out of the ordinary presented itself to the Court. The Court at no time apprised the government or the defense as to these matters because nothing bizarre, irrational or irregular appeared to the Court.

The court concluded that the allegations of a bathroom barricade had "little or no basis in fact" and thus need not be considered in connection with the argument of mental incompetency. The court also ruled, and we agree, that this incident did not provide "evidence of some 'objective' fact of internal impropriety." *Dioguardi, supra* at 79 n. 12; *see Nelson v. United States,* D.C.App., 378 A.2d 657, 660 (1977); note 103, *supra.*

enough detail which suggests, on its face, the need for further inquiry. *See United States ex rel. Daverse v. Hohn,* 198 F.2d 934, 938 (3d Cir. 1952).[105]

The trial court nonetheless noted in its December 16, 1977, opinion that "out of an abundance of caution and in order to assure that an adjudication of incompetency as to the juror did not exist," the court had subpoenaed the juror's psychiatric records from St. Elizabeth's Hospital for *in camera* inspection. On the basis of this inspection the court made the following findings of fact:

1. The juror was voluntarily admitted to the hospital on October 11, 1977, eighty (80) days after the rendition of the verdict. The records indicate absolutely no suggestion that the juror was suffering from a mental disability before or during the trial period. ·

2. The records indicate no adjudication of mental incompetency. The established

psychiatric diagnosis was "adjustment reaction to adult life (hysterical psychosis)." The juror was discharged on October 17, 1977.[106]

The court added:

There was nothing in the demeanor of the juror in question during *voir dire,* trial or deliberations to indicate anything other than that she was attentive, competent and sane.[107]

We do not need to reach the question whether evidence of an adjudication of mental illness or incompetency near the trial date is necessary to justify a hearing. Assuming it is not, we hold that the record here is insufficient to support appellants' request for a hearing on the question of the juror's mental competence. The proffers were too weak; they were unverified, conclusional, and did not evidence a mental infirmity "closely contemporaneous" to trial.[108]

---

**105.** In *Hohn, supra,* the court stated the point in terms appropriate to this case: "If a juror's mental competence is to be attacked at the late stage offered by a habeas corpus proceeding, the charge must be made in much more certain terms and not on a tentative basis. A fishing expedition into a juror's competency may not be employed as a basis to attack a conviction valid on its face. To rule otherwise would be to strike a serious blow at the sanctity of the jury system for any juror, who it was alleged might be suffering from paranoid tendencies, could in effect be put on trial as to his mental competence." *Id.* at 938 (footnote omitted).

We recognize that lay observers cannot give expert insights into someone's mental condition. Thus, even if an adjudication of incompetency were not a prerequisite to challenging the jury verdict, we are aware that anyone convicted of a crime will have a heavy burden, in the absence of probative medical records or testimony, to convince a court that the proffer contains the kind of information warranting fuller inquiry. But that is as it should be, given the many powerful reasons for not permitting impeachment of the verdict. *See Sellars, supra; Government of Virgin Islands, supra; Hohn, supra.* This is not to say, in effect, that lay testimony will never be enough to trigger judicial review; any responsible witness to bizarre behavior is in a position to provide details which a trial judge, as a matter of common sense, should find sufficiently troublesome to investigate further—if they point to incompetency at the time of trial. In the present case, however, the proffer can be characterized as perfunctory; we need not even reach hard

questions about the degree of detail in a proffer necessary to justify a hearing—again assuming, for the sake of argument, that an adjudication of incompetency is not a prerequisite.

**106.** Appellants assert the right to have participated during the court's inspection of these hospital records. They might have a point if their proffer had been sufficiently detailed and probative of incompetence to necessitate a hearing. Here, however, appellants did not meet that threshold. The court's inspection, therefore, was merely a cautionary, nor necessary, exploration which confirmed rather than exposed the weakness of appellants' argument.

**107.** While this lay observation is of marginal relevance, it does reinforce the validity of the trial court's conclusion in the absence of other manifestations of mental infirmity.

**108.** On March 6, 1978, appellants Khaalis, Adam and Salaam filed renewed motions for a new trial, including requests for reconsideration of the court's Opinion and Order of December 16, 1977, for issuance of subpoenas duces tecum, for a court-ordered mental examination, and for a hearing. This time appellants proffered that the juror had been arrested for setting fire to her apartment and that probable cause had been found after a preliminary hearing. The court held that nothing offered in the motions indicated that "the juror in question was suffering from a mental disability before or during trial," and that the arrest and probable cause determination were not within the *Dio-*

## X. ISSUES WARRANTING SUMMARY ANALYSIS

Appellants have raised a number of other issues which warrant only summary analysis.

A. The argument is made that the convictions of armed kidnapping should be reversed because (1) the common law definition of kidnapping, which requires asportation and secrecy, should be incorporated into the statute, D.C.Code 1973, § 22–2101, and there was no asportation or secrecy in this case; (2) the statute is unconstitutionally vague; (3) it is an *ex post facto* law; (4) it violates the Eighth Amendment by specifying only one punishment for all grades of kidnapping; and (5) the kidnapping convictions, in any event, should be merged with the other offenses.

■ These arguments are without merit. Asportation is not an essential element of kidnapping under our statute. *See Robinson v. United States,* D.C.App., 388 A.2d 1210, 1211 (1978); *Sinclair v. United States,* D.C.App., 388 A.2d 1201, 1208 (1978) (Mack, J., dissenting). Secrecy was not an element of kidnapping at common law, 1F. Wharton's Criminal Law § 373, at 740 (1957), nor is it under our statute. Nor can § 22–2101 be held unconstitutionally vague, *see Parker v. Levy,* 417 U.S. 733, 752, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *District of Columbia v. B. J. R.,* D.C.App., 332 A.2d 58, 61, *cert. denied,* 421 U.S. 1016, 95 S.Ct. 2425, 44 L.Ed.2d 685 (1975), or an *ex post facto* law (it has been in effect in its present form since 1933 with only minor revisions not relevant here). Furthermore, contrary to the Eighth Amendment claim that only one form of punishment is provided—and assuming such a claim could have

merit—§ 22–2101 expressly provides for "imprisonment for life or for such term as the court in its discretion may determine." Finally, the kidnappings here do not merge with the other offenses. *Compare Sinclair, supra, and Pynes v. United States,* D.C. App., 385 A.2d 772, 773–74 (1978), *with Robinson, supra.*

■ B. Appellants charge that the jury selection system was unconstitutional because it systematically excluded Hanafi Muslims, and that the trial court should have granted them a hearing to prove their allegations. We disagree. Appellants failed to proffer any statistics or other evidence supporting this contention, despite the trial court's invitation to do so. *See Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522 (1975); *Rosser v. United States,* D.C.App., 381 A.2d 598, 601 n. 1 (1977).

■ C. Appellants allege error in the use of "mug shot" photographs, with their implication of criminality, to aid Rabbi Fishman's identifications, citing *Williams v. United States,* D.C.App., 382 A.2d 1, 4–6 (1978). The reference to photographs, however, was first made by counsel for appellant Khaalis during cross-examination. Later, when counsel for appellant Razzaaq showed the photographs to the witness, care was taken to avoid their being seen by the jury. The photographs were never introduced into evidence or otherwise seen by the jury. There was no error.

■ D. Appellant Adam claims reversible error in the trial court's refusal to sever Count VIII, assault with a deadly weapon. We cannot agree that the court abused its discretion. *See Sousa v. United States,* D.C.App., 400 A.2d 1036, 1041 (1979); *Hor-*

---

guardi exception for "clear evidence of some criminal act." *Id.* at 79. We agree. We also note that the juror was found competent to stand trial on the arson charge.

Appellants also argue that the government's failure to disclose to the defense the juror's post-trial behavior in setting fire to her apartment violated the due process concerns represented by *Brady v. Maryland,* 373 U.S. 83, 83

S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree. Even if such information could, in some circumstances, be deemed material to guilt or punishment, *Brady, supra* at 87, 83 S.Ct. 1194, we have already held that it could not have been so here, as it did not meet any of the exceptions in *Dioguardi, supra,* justifying even a hearing on the juror's alleged incompetence.

ton v. United States, D.C.App., 377 A.2d 390, 392 (1977); Arnold v. United States, D.C.App., 358 A.2d 335, 339 (1976) (en banc); Hurt v. United States, D.C.App., 314 A.2d 489, 491–92 (1974); Baker v. United States, 131 U.S.App.D.C. 7, 26, 401 F.2d 958, 977 (1968).

E. Appellant Khaalis claims reversible error from the trial court's revocation of his conditional release, and commitment to jail without bond, prior to indictment. This issue, however, already has been resolved adversely to Khaalis by this court's affirmance of the trial court's order denying his motion for reconsideration, Khaalis v. United States, D.C.App., No. 12014, June 16, 1977 (unpublished), and by this court's dismissal of a separate pretrial bail appeal after the jury's verdict had been returned. Khaalis v. United States, D.C.App., No. 12253, August 5, 1977 (unpublished).

F. Appellants Adam and Khaalis have raised three additional arguments for the first time in their reply briefs. We denied the government's motion to strike but, upon further review, we find no merit in these contentions.

▪ 1. Specifically, these appellants claim that the lengths of their sentences, and the manner in which they were imposed, amount to cruel and unusual punishment and a violation of due process. The sentences were well within the statutory limits, however, and are therefore not reviewable by this court. Allen v. United States, D.C.App., 383 A.2d 363, 368 (1978); Walden v. United States, D.C.App., 366 A.2d 1075, 1076 (1976); Foster v. United States, D.C.App., 290 A.2d 176, 179 (1972). See Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). Appellants also stress that their counsel was allowed only ten minutes for allocution.

We agree that, given the magnitude of this case, the trial court might well have been willing to listen longer; but each appellant was afforded the opportunity to speak, and we perceive no legal basis for setting aside the verdicts or sentences simply because the period of allocution was kept at a minimum.[109]

▪ 2. Next, appellants have not made a case for the proposition that Super.Ct. Cr.R. 6(d), which precluded appellants and their counsel from appearing before the grand jury, is unconstitutional. See United States v. Mandujano, 425 U.S. 564, 581, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); Watson v. Warden, Maryland Penitentiary, 2 Md.App. 134, 140, 233 A.2d 321, 325 (1967); see also United States v. Tallant, 407 F.Supp. 878, 883 (N.D.Ga.1975); Hammond v. Brown, 323 F.Supp. 326, 338 (N.D.Ohio), aff'd, 450 F.2d 480 (6th Cir. 1971).

▪ 3. Finally, appellants point out that only counsel, not appellants, were present when the jury was brought back into the courtroom, during deliberations, to hear certain tapes in evidence replayed at the jury's request. It is true that "[o]ne of the basic rights guaranteed by the Sixth Amendment is the accused's right to be present in the courtroom at every stage of trial." Heiligh v. United States, D.C.App., 379 A.2d 689, 693 (1977). See Super.Ct. Cr.R. 43(a). However, we need not consider whether that right was violated in this instance, for any conceivable error was harmless. See Smith v. United States, D.C.App., 389 A.2d 1356, 1361, cert. denied, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978).

## XI. CONCLUSION

The central features of this case bear repeating: it was a joint trial of twelve

109. At oral argument, counsel for Khaalis challenged appellants' sentences, alleging racial discrimination. He said:

"The government would like to say—guns, an arsenal. Don't we know that if these men wanted to, they could have killed the whole police department? And they got no credit for that. If they wanted to, they could have shot up the whole city hall, and they didn't.

Indicative of that—they never intended to. They did none of that. And there was a lot of mercy, and a lot of compassion. The people . . . the people who were sick, the old men, the old women, the infirm, the women treated generally, and gently." [Tape # 3 of oral argument at # 776 on the meter]. We reject this argument.

defendants, having individual counsel, over a period of several weeks before a sequestered jury—a trial with a highly emotional content and substantial public interest and visibility. It is not an overstatement to say that this case tested the capacity of our criminal justice system to provide a trial which permitted an orderly presentation of the government's evidence while safeguarding the defendants' constitutional and other legal rights. That was a large order. Understandably, everyone responsible for the process—the prosecutors, defense counsel, and trial judge—were to show their frustrations from time to time to the jury. Much, after all, was at stake—for the defendants and the community as a whole.

We have reviewed the transcript thoroughly and have three overriding impressions. First, the evidence of appellants' guilt of the particular offenses for which they were convicted is overwhelming. Any alleged error in the handling of the case by court or counsel is obscured by that fact. Second, neither the prosecutors nor the trial judge can be said to have overreached the jury. To the contrary, the jury demonstrated its willingness and ability to weigh the evidence carefully, for it acquitted eleven of the defendants on 19 to 22 of the 31 counts [110] charged (Khaalis was acquitted on two). For its conscientiousness, the jury deserves praise and gratitude from all concerned. Finally, despite occasional lapses, the prosecutors, defense counsel, and trial judge performed well under the circumstances. They manifested the highest tradition of the bar and bench—and deserve to be commended.

We conclude that justice under law—to the extent human institutions are capable of achieving it—has been accomplished.

*Affirmed.*

---

110. Appellant Adam was indicted on an additional count of assault with a dangerous weapon, for a total of 32. *See* Part X.D. *supra.*